**David L. WEHRLY, Plaintiff,**

v.

**AMERICAN MOTORS SALES CORP., Defendant.**

**Civ. No. F 86–248.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Feb. 12, 1988.

Perry D. Shilts, Snouffer, Haller & Colvin, Fort Wayne, Ind., for plaintiff.

Vincent J. Backs, Beers, Mallers, Backs, Salin & Larmore, Fort Wayne, Ind., Susan B. Tabler, S.R. Born, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

American Motors Sales Corporation has filed a motion for summary judgment. The motion is fully briefed and ripe for a ruling. For the following reasons, the motion for summary judgment will be granted.

## I.

### *Summary Judgment Standards*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *Valentine v. Joliet Tp. High School Dist. No. 204,* 802 F.2d 981, 986 (7th Cir.1986).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact. *Celotex,* 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 106 S.Ct. at 2511.

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 106 S.Ct. at 2512.

 The plaintiff cites *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 640 (5th Cir.1985), for the proposition that summary judgment is generally an inappropriate tool for resolving claims of employment discrimination, which deal with issues of motivation and intent. It is true, as this court has noted in the past, that the application of summary judgment standards must be approached with special caution in intentional discrimination cases. *Beard v. Whitley Co. REMC*, 656 F.Supp. 1461, 1464 (N.D.Ind.1987), *aff'd*, 840 F.2d 405, 411 (7th Cir.1988). That is not because there is something mystical about intentional discrimination cases, which somehow makes summary judgment inappropriate, but rather, because questions of motivation and intent are difficult to resolve short of trial. But, even when motive or intent are at stake summary judgment is proper "where the plaintiff presents no indications of motive and intent supportive of his position." *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986). "The court should 'neither look the other way' to ignore genuine issues of material fact, nor 'strain to find' material fact issues where there are none...." *Beard*, 840 F.2d 405, 410.

Beyond these general observations the court would note that *Thornbrough* was decided before the Supreme Court decided *Celotex, Anderson* and *Matsushita, supra.* Indeed, in *Anderson*, the Supreme Court rejected the argument that the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue. *Anderson*, 106 S.Ct. at 2510–11. Even before the Supreme Court decided *Celotex, Anderson* and *Matsushita*, the Seventh Circuit had recognized that summary judgment could appropriately be granted in intentional discrimination cases, including age discrimination cases. *See Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1217–18 (7th Cir.

1985). Indeed, in *Allis–Chalmers*, the court held that it was "not required to evaluate every *conceivable* inference which can be drawn from evidentiary matters, but only reasonable ones." *Id.* at 1218, *quoting Parker v. Federal National Mortgage Ass'n.*, 741 F.2d 975, 980 (7th Cir.1984). *See also Huhn v. Koehring Co.*, 718 F.2d 239 (7th Cir.1983); *Kephart v. Institute of Gas Technology*, 630 F.2d 1217 (7th Cir. 1980). The Seventh Circuit has continued to apply summary judgment standards to intentional discrimination cases (in the same way) since the Supreme Court's decisions in *Celotex, Anderson* and *Matsushita.* *See, e.g., Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir.1987); *Dale v. Chicago Tribune Co.*, 797 F.2d 458 (7th Cir.1986). The Fifth Circuit's decision in *Thornbrough* notwithstanding, American Motors will be entitled to summary judgment if there are no genuine issues of material fact.

## II.

### *Factual Background*

#### A. *The Parties*

American Motors hired the plaintiff as a district sales manager on January 3, 1972. The plaintiff was 42 years old. (Complaint, ¶¶ 4, 7). Before being hired by American Motors, the plaintiff had worked at his father's Dodge–Chrysler dealership in Portland, Indiana. (Pf.Dep., pp. 6–7; Pf. Dep.Ex. 1). In 1962, the plaintiff was hired by Chrysler as a corporate auditor. (Pf. Dep., pp. 6–7; Pf.Dep.Ex. 1). Thereafter, the plaintiff worked as a district sales manager for Chrysler, living in Fort Wayne and handling a 50 mile area surrounding Fort Wayne, Indiana. (Pf.Dep., pp. 7, 8). In 1969, the plaintiff began working as a general sales manager for a Chrysler dealership in Fort Wayne, Indiana, where he had complete control over the profit and loss of the dealership and where he supervised 30 to 35 people in sales and service. (Pf.Dep., pp. 9, 10).

During his employment with American Motors, the plaintiff worked as a district sales manager in the territory surrounding Fort Wayne, Indiana. (Pf.Dep., pp. 13, 20–

21, 23, 74–75, 111; Levy Dep., pp. 8–9). The boundaries of sales areas are constantly in flux because existing dealerships close and new dealerships open. (Pf.Dep., pp. 19–20; Polan Dep., p. 7). During plaintiff's employment with the defendant, he served as a district sales manager for the Kalamazoo region, and for approximately one year he managed both the Fort Wayne territory and the Kalamazoo territory. (Pf.Dep., pp. 19–20).

Defendant American Motors Sales Corporation (American Motors) is a wholly-owned subsidiary of American Motors Corporation. The defendant markets and sells, throughout the United States and Canada, American Motors Corporation vehicles. (Noles Dep., pp. 3–4; Wilhelm Dep., p. 7). American Motors sells its vehicles through dealerships, most of which are independently owned, but some of which are owned and operated directly by American Motors. (Pf.Dep., p. 144; Storm Dep., p. 22). Sales managers are responsible for servicing dealerships and are assigned a number of dealerships in a geographical area. These sales managers are responsible for securing new car orders, insuring that dealers follow factory policies and practices, and assisting dealers in promoting and selling cars. (Pf.Dep., pp. 21–23; Storm Dep., pp. 53–54; Levy Dep., p. 9; First Prod.Exs. O and P).

**B.** *Sales Structure of Defendant's Business*

American Motors has district sales managers, who service areas with small to medium size dealerships and city sales managers, who service major metropolitan areas with large dealerships. A district sales manager's job is classified as labor grade 10 (Wilhelm Dep., p. 9; First Prod.Ex. D). Since city sales managers are entrusted with larger volumes of the defendant's business and since they must be adept at marketing techniques unique to large, metropolitan dealerships, their position is rated at a labor grade of 11, a higher grade than the district sales manager's grade. (Noles

Dep., pp. 18, 34; Wilhelm Dep., pp. 9, 22–23; Storm Dep., pp. 37–38, 48; Levy Dep., pp. 7–8, 21–23; Lovitt Dep., p. 13; First Interr. No. 2).[1]

**C.** *Gradual Decline of the Defendant's Business*

It is an undisputed fact (and a very important fact if this case is not to be decided in a vacuum) that the defendant's business steadily declined from approximately 1975 through the present. (Pf.Dep., p. 58; Storm Dep., p. 8). Around 1975 through 1976, sales began to deteriorate (Pf.Dep., p. 16), and the plaintiff's district was moved from the Chicago zone to the Detroit zone. (Pf.Dep., pp. 15–16; Pf.Dep.Exs. 13, 15). In 1978, the Houston, Texas zone was closed. (Storm Dep., pp. 4–5). The defendant kept making the zone areas larger and larger because it kept closing zone offices. (Pf.Dep., p. 66). In the 1982 reduction, 12 zones were reduced to eight. (First Interr. No. 8, 9; Storm Dep.Exs. 3, 4).

By May, 1985, the defendant's business had declined to such an extent that it was necessary to eliminate 25% of the work force. (Levy Dep., p. 32; First Interr. No. 9, 10; First Prod.Ex. K). To pare down administrative cost, the defendant eliminated four of 12 zones. The Detroit zone, which included plaintiff's district, was merged with the Pittsburgh zone, to form the new Great Lakes region. (First Interr. No. 8, 9; Storm Dep.Exs. 3, 4). The dealerships were redivided among the remaining eight zones, each of which was larger than the predecessor zones.

In the same way that the number of zones was reduced and the size of the remaining zones expanded, the number of sales districts within each zone was reduced. Whereas the territory encompassed by the former Detroit and Pittsburgh zones contained six city districts and 15 regular districts, in the Great Lakes region the same territory was divided into seven city districts and eight regular districts. Thus,

---

**1.** The simple fact that a city sales manager's job is graded 11, rather than 10, belies the plaintiff's factual position that the jobs are the same. As the defendant points out, it would not voluntarily pay city sales managers more than district sales managers for doing the same job.

overall, six of 21 manager's positions were eliminated. (Noles Dep., pp. 22–24; Storm Dep., pp. 29, 46; First Interr. No. 8, 9; First Prod.Exs. B, C; Storm Dep.Exs. 3, 4).

### D. *1985 Reduction in Force*

As noted earlier, by May 1985, the defendant's business had suffered such a decline that the 25% reduction in force was necessary. (Levy Dep., p. 32; First Interr. No. 9, 10; First Prod.Ex. K). In the May, 1985 reduction in force, the plaintiff's district was eliminated; that is, it was absorbed into adjacent districts. The bulk of the plaintiff's former district was absorbed into the Indianapolis district, which was elevated to a city district because of the expanded sales volume and responsibility. Other portions of the plaintiff's former Fort Wayne district were absorbed into Michigan and Ohio districts. (Pf.Dep., p. 111; Noles Dep., pp. 26, 28; Wilhelm Dep., p. 23; Storm Dep., pp. 36, 43).

### E. *Elimination of the Plaintiff's Fort Wayne District and Offer to Relocate in Saginaw, Michigan*

Upon elimination of the plaintiff's district in the 1985 reduction in force, the plaintiff was offered a comparable sales district in Saginaw, Michigan.[2] The Saginaw district had approximately the same number of dealerships (of the same approximate size), and the same overall sales volume as the Fort Wayne district. (First Interr. No. 29(h); First Prod.Exs. I, J). Plaintiff was to *retain his job classification* as a district manager in Saginaw and would suffer *no loss of wages.* The plaintiff was informed that the position in Saginaw involved relocation to Saginaw and that the defendant would pay basic moving expenses. (Pf.

**2.** The plaintiff, in his Brief in opposition to the motion for summary judgment, concedes that the Saginaw, Michigan district was comparable with the Fort Wayne district.

**3.** The plaintiff states that he was to receive "no relocation expenses." *See* Brief in opposition to the motion for summary judgment. This contention, presumably supported by Storm's deposition testimony, raises no genuine issues of material fact. The plaintiff was offered basic moving expenses, which included "moving as-

Dep., pp. 119–20; Noles Dep., p. 45; Wilhelm Dep., p. 36; Storm Dep., p. 61).[3]

The plaintiff was offered the Saginaw district on May 22, 1985. The plaintiff was not interested in the Saginaw district and asked Assistant Zone Manager Mike Storm, who related the offer, to try and work out a mutual agreement to get early retirement. (Pf.Prod.Ex. A, p. 4). Storm consulted with Noles, who determined that plaintiff did not qualify for early retirement. (Noles Dep., p. 37; Storm Dep., pp. 64–65). After learning that early retirement was not available, the plaintiff inquired about the new Indianapolis city sales area, which had been upgraded from a district manager's position to a city sales manager's position. Storm informed the plaintiff that no decision had been made regarding an assignment to the Indianapolis area and the following exchange occurred:

Plaintiff: And you don't want to give that to me apparently.

Storm: No. *No based on the current performance and past performance and sales as indicated by performance reviews.*

Plaintiff: O.K. and you made a decision then forcing me to go ahead and request that you fire me and give me my severance then.

Storm: *Well, no. All we are giving you is offering you a job in which you will have to relocate to Saginaw,* as just between you and I, *there will be a lot of other people requested to relocate all various places.*

Plaintiff: Just go ahead and figure out what my severance is and let me know, Mike.

sistance" and "temporary housing assistance." (*See* Plaintiff's dep., pp. 119–20; Noles dep., p. 45; Wilhelm dep., p. 36; and Storm dep., p. 61). The court accepts the plaintiff's position that he was required to locate to the city of Saginaw, Michigan. This fact, while it is in dispute, does not create a genuine issue of material fact because it does not change or affect the outcome of the litigation, as subsequent analysis shows. *See Anderson,* 106 S.Ct. at 2510 (substantive law identifies which facts are material).

(Pf.Prod.Ex. A, p. 7) (emphasis added). The plaintiff, from then on, was unequivocal about leaving the company, rather than taking the Saginaw district. (Pf.Prod.Exs. A–C). The plaintiff's termination was effective on May 31, 1985. (Pf.Dep., pp. 100–101).[4]

The plaintiff telephoned Mr. Noles concerning recall in July, 1985. Noles offered the plaintiff another district sales manager's position in Wheeling, West Virginia. Again the plaintiff rejected the position. (Noles Dep., p. 40; Storm Dep., p. 58; Pl. Prod.Ex. B). The plaintiff was not recalled and was, therefore, effectively terminated.

The court notes a number of important points. First, the requirement that plaintiff reside in the district in which he was to serve (in Saginaw) was a requirement imposed on all managers in May, 1985. (Noles Dep., p. 45; Wilhelm Dep., pp. 35–36, 43; Storm Dep., pp. 61, 63).[5] The relocation allowance offered to the plaintiff was the same allowance offered to all district managers in May, 1985. (First Interr. No. 27; Wilhelm Dep., pp. 36–37). In the past better relocation packages had been offered on occasion to district managers, but not always. (*See* Pf.Dep., pp. 63–67, 76).[6]

### F. Offer of the Indianapolis City Sales Area to Brundage

As noted earlier, the plaintiff rejected the Saginaw district. After the plaintiff's rejection, the position was offered to a former manager from the Pittsburgh zone, Michael Oberschelp, 25 years old, who resigned shortly thereafter. Mr. Levitt was then recalled to the position but he too resigned.[7] The position was then held by Robert Lovelace, who was promoted after one year to city sales manager.

The new Indianapolis city sales area was awarded to former district sales manager Charles Brundage. Mr. Brundage, 36 years old when he was hired, had successfully managed the Indianapolis city area for Ford Motor Company for 10 years. Brundage was originally hired in February, 1985. Three months later, the massive reduction in force occurred and he was laid off. Brundage was called back as the Indianapolis city sales manager by Noles, because of his familiarity with the Indianapolis market and his extensive experience there, and also because Noles considered his training with Ford excellent. (Noles Dep., p. 39; Wilhelm Dep., pp. 21, 41, 48; Storm Dep., pp. 15–16, 20–21; First Interr. No. 5, 29(k), 29(1); First Prod.Ex. D, p. 2). Storm considered Brundage eminently well qualified to handle the Indianapolis market:

Q: After the hiring of Mr. Brundage, is there a training period for an employee for a position that he was hired for? Is there a training period they go through?

A: Well, unfortunately we have no formalized training. It's a matter of immediate supervisor assisting the individual in his training. Fortunately with Brundage, in his case he had considerable time at Ford. I don't know if it was 8, 10 years. He was very, very familiar with the district manager, city manager type thing, so that training was minimal at that point, too.

\* \* \* \* \* \*

4. The defendant's records state that the plaintiff's reasons for leaving were "reduction in force. The relocation offered was not acceptable. Employee chose a layoff status. The employee would have stayed if he were assigned a district in the proximity of where he lives." (First Prod., Ex. F, p. 2).

5. The plaintiff's position that those who later served in Saginaw were not required to reside there does not create a genuine issue of material fact. (*See* Deft.'s answer to First Interr., no. 24). It is undisputed that the requirement existed for all managers in May, 1985.

6. The plaintiff's brief in opposition to the motion states that a "general feeling" existed that defendant transferred employees from one area to another without relocation assistance to force terminations. General feelings, however, are not competent under Fed.R.Civ.P. 56 to create genuine issues of material fact.

7. It is interesting to note that the Saginaw district was originally made available to the plaintiff (54½ years old at the time) after Sherman Levitt (25 years old at the time) was laid off. It was only after the plaintiff rejected the Saginaw offer that Levitt was recalled. (First Interr. 24; Storm dep., pp. 61–62).

Q: What was it concerning Mr. Brundage at the initial interview or during the hiring process that caused you to recommend him for employment with AMC?

A: Having had previous experience with a car company, especially Ford's, which in my mind had a very good training program. I had spent seven years with Ford and I felt they did a very good job of training, and he had considerable experience with them doing that type of work. And to me it was perfect. He could step in almost immediately doing the job other than much formalized training other than indoctrination to forms, procedures and those types of things.

(Storm Dep., pp. 15, 20–21). Storm's boss, Noles, testified that Brundage was hired with a view toward making him city sales manager of Indianapolis. (Noles Dep., p. 39). The evidence is undisputed that Brundage had 10 years experience in the Indianapolis city area.

While the plaintiff had approximately 10 years experience as a district sales manager with the defendant, the plaintiff had no experience as a city sales manager. (Pl. Prod.Ex. B, p. 1; Noles Dep.Ex. 6, pp. 1–2; Noles Dep., pp. 30–32, 35–36, 38; First Interr. No. 3, 4). While the job of a district sales manager and a city sales manager are basically the same, there are critically important differences. (Levy Dep., p. 7). Unlike the district manager, the city manager is responsible for larger dealers, larger volumes of sales, more sophisticated dealers, more visibility as far as sales responsibilities are concerned, and larger sales responsibilities generally. (Levy Dep., p. 7). Moreover, the size of the market itself is much larger for a city sales manager. (Levy Dep., pp. 7, 21–23).

The evidence is undisputed that the plaintiff, as a district manager, had no experience as a city sales manager.[8] The evidence is also undisputed that this was part of the reason that the plaintiff was not selected for the Indianapolis city sales manager position. This was communicated to the plaintiff by Mr. Noles in in July:

Plaintiff: Again my question and concern was why Charles Brundage who has been with the Company just a short time ...

Noles: I know, but he has 10 years' experience.

Plaintiff: My experience didn't mean anything, then?

Noles: *Yeah, your experience means something, but you were never a city manager and Brundage was.*

Plaintiff: But not with us was he?

Noles: *No, but he's got the potential and ability and the background, all ... all those kinds of things that I need for that City district and that's a very big district now.*

Plaintiff: Of course, I consider what I did with Chrysler as far bigger than what that is.

Noles: Well, but the thing is, Dave, it doesn't show up on any of your personnel evaluations.

Plaintiff: As far as what now?

Noles: As far as potential for being a city manager.

　　＊　　＊　　＊　　＊　　＊　　＊

Noles: *Cause everything that I see in your file is that you can't be a city manager—that you are fine as a district manager, and that's why I'm willing to give you a position as a district manager.*

(Pl.Prod.Ex. B, p. 1; Noles Dep.Ex. 6, pp. 1–2; *see also* Noles Dep., pp. 30–32, 35–36, 38; First Interr. No. 3, 4) (emphasis added). Two facts are undisputed: (1) the plaintiff had never managed a large city sales area; and (2) the defendant considered this important in selecting the city sales manager for Indianapolis and communicated this to

---

8. In 1982, the plaintiff was asked to transfer from Fort Wayne to Cincinnati. At the time, Cincinnati was a sales district and not a city sales area. The fact that he was asked to go to Cincinnati, which later became a city sales area, does not create genuine issues of material fact with respect to the plaintiff's qualifications to manage the Indianapolis city sales area. There is nothing in the record to suggest that the plaintiff would have remained in Cincinnati after it was upgraded to a city sales area.

the plaintiff as one its reasons for not selecting him for that position.[9]

### G. *Plaintiff's Evaluations and Work History*

The decision not to award plaintiff the Indianapolis city sales area was based in part upon the plaintiff's evaluations. (Pf. Prod.Ex. A, p. 7; Storm Dep.Ex. 6, p. 2). The plaintiff's evaluations, particularly those which came later in his employment with the defendant, indicate that he was not qualified for the city sales manager's position. The plaintiff was evaluated by seven different sales managers and seven different zone managers. (Pf.Exs. 4–31). The plaintiff was rated "satisfactory" on seven occasions (1972, 1973, 1974, 1975, 1982, 1983 and 1985); the plaintiff was rated "satisfactory plus" on one occasion (1976); the plaintiff was rated "good" on five occasions (1977, 1978, 1979, 1981 and 1984); and the plaintiff was rated "good plus" on one occasion (1980). (Pf.Dep.Exs. 4–31). Plaintiff's ratings, therefore, started as "satisfactory," rose to "good" during the years from 1976 through 1981, and tapered off to primarily "satisfactory" in the last four years of his employment. The defendant has not disputed that plaintiff was qualified as a district sales manager.

The plaintiff's evaluations consistently show that he was not promotable to a city sales manager.[10] In his first year of employment the plaintiff was rated not a prospect for promotion because he was deemed a "career district manager" and because he "will not leave area." (Pf.Dep.Ex. 5). For the next few years, the plaintiff was considered a candidate for promotion to an *auditor's position* because of his "accounting background and retail experience." (Pf.Dep.Exs. 10, 12) (emphasis added). In another evaluation the plaintiff was considered qualified for the auditor's position because he "displays plodding approach and accounting experience that would fit job responsibility." (Pf.Dep.Ex. 14). In 1976, the plaintiff was considered for promotion to a staff administration manager's position because he "does not display the aggressiveness required to develop and direct employees on the department head level." (Pf.Dep.Ex. 16; Polan Dep., p. 14). After rejecting the opportunity to advance to a staff job because of the relocation requirement, the plaintiff was considered non-promotable for the next five years because he had made it clear that he did not wish to relocate. (Pf.Dep.Exs. 18, 20, 22, 24, 25; Levy Dep., p. 16). In 1982, the plaintiff's new supervisors deemed him unpromotable because "employee lacks the aggressiveness, commitment and ambition required and is unwilling to relocate at this time." (Pf.Dep.Ex. 26). In 1983, the plaintiff affirmed his desire to remain in Fort Wayne. (Pf.Dep.Ex. 50). And as late as 1984, the plaintiff was again rated not promotable because "employee does not display aggressiveness nor leadership qualities required of a city manager." (Pf. Dep.Ex. 29; Levy Dep., p. 19).

As noted earlier, the evidence is undisputed that the defendant's business was in decline from the mid–1970s through the present. The plaintiff himself admitted that since 1980, prospects for promotion were scant. (Pf.Dep., p. 58). With respect to evaluations, a number of material facts emerge which are not materially in dispute. First, the plaintiff's evaluations were relied upon by the defendant in denying him the Indianapolis city manager's position. Second, the plaintiff's evaluations clearly show that while he might have been qualified for

---

**9.** The plaintiff asserts that he serviced a territory as large as the Indianapolis city area, with a similar number of dealerships. But the defendant was concerned with the large dealerships, the large volume of sales, and the size of the Indianapolis market. (Levy dep., p. 7). The evidence is undisputed that neither the Fort Wayne nor the Kalamazoo territories serviced by the plaintiff were comparable to the Indianapolis city sales area.

**10.** The defendant agrees that the plaintiff was qualified as a district sales manager, but argues that the plaintiff was not qualified for the very different city sales manager position. On the issue of promotability to the city sales manager's position the facts are not in dispute—the plaintiff's evaluations were very unfavorable.

other kinds of promotions, he was not qualified for the city manager's position.[11]

## H. *Special Early Retirement*

As noted earlier, when the plaintiff was offered the Saginaw district sales manager's position, he sought special early retirement instead. The defendant offers special early retirement only during reductions in force and only if three criteria are satisfied: (1) the employee must have worked for the defendant for at least 10 years; (2) the employee must be at least 55 years old; and (3) the departure of the employee must make a slot available for another employee whom the defendant judges indispensible, or the employee's position must be eliminated with no suitable position available. (Wilhelm Dep., pp. 13–14, 26, 33; First Prod.Ex. E, p. 3). The plaintiff was 54½ years old when he sought special early retirement in May, 1985. The evidence is undisputed that the defendant claimed that the plaintiff was ineligible for special early retirement because he was not 55 years old and because a position was available for him and there was no one indispensible to be protected. (Pf.Prod.Ex. A, p. 6). It is also a fact that the Saginaw district (which the plaintiff rejected) was made available to the plaintiff through the layoff of Sherman Levitt, who was 25 years old at the time. (Pf.Dep.Ex. D, p. 2). Only one district sales manager (Mr. Maynard, age 55) in the new Great Lakes region was offered early retirement and he rejected the offer and retained his prior position. (Wilhelm Dep., pp. 29–30). The evidence is therefore undisputed that no district sales manager actually took early retirement. (First Prod.Ex. D).

## I. *Overview of Changes Caused by Reduction-in-Force*

Before the May, 1985 reduction-in-force, there were 21 sales manager positions in the Detroit and Pittsburgh zones, six city manager positions and 15 district manager positions. Three of the positions were unmanned on the eve of the reduction-in-force. (Wilhelm Aff.). The new Great Lakes region contained 15 sales manager positions, eight city manager positions and seven district manager positions. Of these 15 positions, 10 survived the 1985 reduction-in-force without change and were filled by incumbents. The two remaining districts which survived the reduction-in-force without change were the Saginaw, Michigan district and the Cincinnati, Ohio city district. As noted earlier, the plaintiff was offered the Saginaw, Michigan district, but declined to accept it. With respect to the Cincinnati city district the 34 year old incumbent was bumped out and replaced by a 36 year old city manager from Columbus, Ohio.

The remaining five districts after the reduction-in-force included two regular districts and three city districts, including two Pittsburgh city districts and the Indianapolis city district. The Pittsburgh city districts were filled with higher-ranking management employees, who were demoted to sales managers. The Indianapolis city district was ultimately awarded to Mr. Brundage, age 36, after it had been rejected by a number of others. (First Prod.Ex. D; Wilhelm Dep., pp. 24–25; Storm Dep., pp. 38, 49).

Three of the 15 new sales-manager positions in the new Great Lakes region were occupied by higher-ranking management employees, leaving only 12 positions to be filled with the 18 sales managers existing

---

**11.** The plaintiff attempts to raise genuine issues of material fact by arguing that Storm, his supervisor in 1985, thought that if a district sales manager could handle responsibilities in one district, he could also handle them in another. (Storm Dep., pp. 41–42). But this does not create any genuine issues of fact. The Indianapolis city area was not just another district—it was a city area and is distinguishable on that basis. Moreover, Storm made it clear that he rejected the plaintiff based on "current and past performance and sales as indicated by performance reviews." (Storm Dep.Ex. 6, p. 2). Levy, contrary to plaintiff's position, never recommended the plaintiff for the Indianapolis position. Levy recommended the plaintiff for two administrative positions because of his accounting background. (Levy Dep., p. 17). The plaintiff also points to a number of awards he received as a district sales manager. These awards only show that plaintiff was qualified as a district sales manager, a fact not in dispute.

at the time of the reduction-in-force. Since, as mentioned earlier, incumbents remained in eight of these positions, only four positions remained to be shared among 10 employees. The four positions included the Indianapolis city district, the Cincinnati city district, the Columbus regular district, and the Saginaw regular district. The 10 positionless employees who were left after the reduction-in-force included Daquila (age 35), Mitchell (age 46), plaintiff (age 54½), Levitt (age 27), Oberschelp (age 24), Brundage (age 36), Stoker (age 30), Fox (age 67), Weisman (age 36), and Carmack (age 34). Fox retired, leaving nine employees for four positions. The two remaining regular districts, Columbus and Saginaw, were offered as lateral transfers to Mr. Mitchell and the plaintiff. Mitchell accepted the Columbus position and remained employed; the plaintiff rejected the Saginaw position and was laid off. The next oldest displaced district manager, Daquila (age 35), was offered a comparable position and, like the plaintiff, declined it and was laid off. The Saginaw position ultimately went to Oberschelp, who was originally slated for layoff.

Mr. Weisman and Mr. Carmack received the initial offers for the Cincinnati and Indianapolis city districts. Weisman was offered the Cincinnati district previously held by Carmack. Carmack, in turn, was offered another position which he declined, and he was laid off. The Indianapolis position was then offered as a promotion to Mr. Brundage who, at age 36, was the oldest remaining sales manager slated for layoff. (Noles Dep., p. 30; Wilhelm Dep., pp. 50–51; First Prod.Ex. D).

## III.

### *Legal Claims Under the Age Discrimination in Employment Act*

■ The plaintiff is relying upon the Age Discrimination in Employment Act (ADEA), which states, in pertinent part:

(a) It shall be unlawful for an employer—

(1) To fail or refuse to hear or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a) (1982). The ultimate burden on a plaintiff in an age discrimination case is to prove that he was discharged because of his age. *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984).

If, as in this case, the plaintiff presents no direct evidence of age discrimination, the shifting burdens set forth by the Supreme Court provide an indirect method of proof. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 462 (7th Cir.1986). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court set forth a three step procedure by which a plaintiff can indirectly prove intentional discrimination. Pursuant to that three step paradigm, a plaintiff carries the initial burden of establishing a prima facie case of age discrimination. *Dale*, 797 F.2d at 462. "The 'prima facie case' in the law of discrimination is a shorthand for the constellation of events that raises a suspicion of discrimination—enough so to require the employer to explain his conduct." *Henn v. National Geographic Society*, 819 F.2d 824, 828 (7th Cir.1987).

If the plaintiff successfully establishes a prima facie case of age discrimination, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action taken. *Dale*, 797 F.2d at 462. If the employer carries this burden, then the employee must prove by a preponderance of the evidence that the employer's explanation was a mere pretext for discrimination. *Matthews*, 769 F.2d at 1217. In this context, pretext means "pretext for discrimination," and not merely that the employer's articulated reason for its action is untrue. *See Pollard v. REA Magnet Wire Co.*, 824 F.2d 557, 559 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Throughout the three-step procedure the plaintiff retains the burden of persuasion.

*Reeder–Baker v. Lincoln National Corp.,* 649 F.Supp. 647, 653 (N.D.Ind.1986), *aff'd,* 834 F.2d 1373 (7th Cir.1987).

It is now well established that the elements of a prima facie case may be modified to accompany the type of claim asserted by the plaintiff. *See, e.g., Matthews,* 769 F.2d 1215, 1217, modifing *McDonnell Douglas–Burdine* requirements to fit age discrimination reduction-in-force cases. A review of the record and the briefs which have been filed in this case indicates that the plaintiff is actually making three separate claims: (1) the plaintiff claims that he was constructively discharged when he was offered the district manager's position in Saginaw, Michigan; (2) the plaintiff claims that he was discriminated against because of his age when the defendant denied his request for special early retirement; and (3) the plaintiff claims that he was discriminated against because of his age when he was denied a promotion to the city sales manager's position in Indianapolis, Indiana.[12] The court will now analyze each of these three claims in turn.

## A. The Plaintiff's Claim that He Was Constructively Discharged

This claim arises out of the May, 1985 reduction-in-force. As a part of the 25% reduction-in-force, the plaintiff's Fort Wayne, Indiana district had been eliminated. Upon elimination of the Fort Wayne district the plaintiff was not fired, but rather, offered relocation to Saginaw, Michigan, a comparable sales district. Plaintiff was to retain his title as a district sales manager, with the same pay. As noted in the facts, the plaintiff was offered a basic relocation allowance. Like all other district managers at that time, the plaintiff was

required, as a part of the Saginaw, Michigan offer, to reside in the district; and for purposes of the motion for summary judgment, the court has concluded that the plaintiff was required to reside within the city of Saginaw. The plaintiff claims that the defendant's offer of a comparable position in Saginaw, Michigan was really a pretext for age discrimination, amounting to constructive discharge.

### i. The Prima Facie Case

■ In a standard age discrimination case, a plaintiff establishes a prima facie case by showing: (1) that he belongs to the protected age group (40 through 70); (2) that he was performing his job satisfactorily; (3) that he nevertheless was fired; and (4) that his employer sought someone to perform the same work after he left. *Matthews,* 769 F.2d at 1217. In a reduction-in-force case, however, the last element has no role, since when the employer reduces his work force he hires no one to replace the one who was fired. *Id.* at 1217. Thus, in a reduction-in-force case the elements of a prima facie case are modified.

■ To establish a prima facie case of age discrimination in a reduction-in-force situation the plaintiff must show: (1) that he was within the protected age group (40 through 70); (2) that he was *adversely affected,* either by discharge or by demotion; (3) that he was qualified to assume another position at the time; and (4) that evidence exists from which a factfinder might reasonably conclude that the employer *intended to discriminate* in making the employment decision at issue. *Ayala v. Mayfair Molded Products Corp.,* 831 F.2d 1314, 1318–19 (7th Cir.1987). *See also*

12. When the defendant framed the issues in its motion for summary judgment it included a fourth issue: that the defendant discriminated against the plaintiff when it eliminated his sales district in the May, 1985 reduction in force. The plaintiff's brief in opposition to the motion for summary judgment does not respond to this issue, and for good reason. It would be ludicrous to argue that American Motors revamped the entire country's sales districts simply to eliminate the plaintiff's job, because it wanted to discriminate against him. This is particularly true in light of the undisputed fact that since

the mid–1970s the defendant's sales business has been in decline. Assuming arguendo that the plaintiff could somehow establish a prima facie case of age discrimination with respect to the elimination of his district in the 1985 reduction in force, the court is convinced that there was a legitimate non-discriminatory reason for eliminating the plaintiff's district which cannot be shown to be pretextual; business necessities forced the defendant to undergo a massive reduction in force. The court will, therefore, limit its analysis to the three issues outlined above, the issues to which the plaintiff has responded.

*Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1424 (7th Cir.1986); *Matthews,* 769 F.2d at 1217. This modification of the elements of the prima facie case simply recognizes the special nature of reduction-in-force situations. *Matthews,* 769 F.2d at 1217. The fourth element of the prima facie case puts an additional burden on the plaintiff during the first stage of the three stage paradigm.

■ The defendant concedes that the plaintiff can establish the first and third elements of the prima facie case; that is, that he was within the protected age group and that he was qualified to assume another position as a district sales manager. But the defendant argues that the plaintiff was not adversely affected, so that he cannot establish the second element of the prima facie case. The defendant also argues that the plaintiff can produce no evidence from which a factfinder might reasonably conclude that it intended to discriminate when it offered to relocate him in Saginaw, Michigan.

The court agrees that the plaintiff cannot establish the second and fourth elements of the prima facie case. In *Ayala,* an age discrimination case which also took place within a reduction-in-force context, the plaintiffs were discharged rather than transferred to other departments. *Ayala,* 831 F.2d at 1316. Similarly, in *Matthews,* also a reduction-in-force case, the plaintiff (who also happened to be 54 years old at the time) was discharged. In both *Ayala* and *Matthews,* the second element of the prima facie case, that the plaintiff was adversely affected, was satisfied by the fact that the plaintiffs were discharged. *Matthews* seems to define adverse action, a second element of the prima facie case, as "discharge or demotion ..." *Matthews,* 769 F.2d at 1217. *Ayala* defines it the same way. *Ayala,* 831 F.2d at 1318. In this case the plaintiff was neither discharged nor demoted. Rather, he was offered a relocation package in Saginaw, Michigan, with the same job title and pay. The plaintiff cannot show, therefore, that he was adversely affected within the meaning of *Ayala* and *Matthews.*

In *Matthews,* the court noted that, "The mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination." This is because the plaintiff's termination is due to economic necessities, and not to age. If *termination* during a reduction-in-force, in and of itself, is insufficient to establish a prima facie case of age discrimination, then an *offer of relocation* with the same job title and pay is certainly insufficient to establish a prima facie case of age discrimination.

The plaintiff may, of course, try to make the argument that the offer of relocation in Saginaw, Michigan was not a comparable offer or was such that it somehow amounted to constructive discharge. The court will take these objections up in turn.

The problem with the plaintiff's argument that the offer to relocate in Saginaw was not a comparable offer, or that it was somehow inadequate, is first that such an argument overlooks the fact that an offer to relocate (and thus to continue working for the defendant) was extended during a reduction-in-force period. If termination does not raise an inference of discrimination, it would seem absurd to suggest that an inadequate offer somehow can raise an inference of discrimination. But even if an inadequate offer could somehow raise an inference of discrimination, the facts in this case show that the offer to relocate in Saginaw was an excellent one. The plaintiff was to perform the same job, with the same title, and with the same pay. What more can the law ask of a defendant who is reducing its work force by 25%?

The problem with the plaintiff's second argument, the argument that he was constructively discharged, is twofold. First, the argument overlooks the elements of the prima facie case in a reduction-in-force situation. Even if the plaintiff could somehow show that he was constructively discharged, thus satisfying the adverse action element of the prima facie case, the plaintiff would have to additionally show that the fourth element of the prima facie case had been satisfied, that there was some

evidence from which a factfinder might reasonably conclude that the defendant intended to discriminate in making him the Saginaw offer. The second problem with the constructive discharge argument is that the plaintiff simply cannot show, on the facts of this case, that the Saginaw offer amounted to constructive discharge.

"An employer constructively discharges an employee only if it 'makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation....'" *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986) (*quoting Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir.1982)). In this case, the only thing that made Saginaw intolerable to the plaintiff was the fact that he was required to live in Saginaw, Michigan and the fact that he was not given a complete relocation package. The evidence is undisputed that the plaintiff was given basic relocation allowances, the same allowance given to other district managers at the same time. The evidence is also undisputed that the defendant's requirement that the plaintiff live in Saginaw was a requirement imposed on all district managers *at that time*. The fact that that may have not been true in the future, or at some later date, is not important. Neither of these two facts make the Saginaw offer so intolerable that the plaintiff was, in effect, forced to refuse it. Beyond that, this court is in no position to "sit as a super-personnel department that reexamines an entity's business decisions." *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir.1987), *quoting Dale v. Chicago Tribune Co.*, 797 F.2d 458, 564 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). If the defendant wants to require its district sales managers to live within the districts they manage, the court has no business second guessing that judgment. So the court does not think that the plaintiff can argue that he was adversely affected, by arguing that he was constructively discharged when he was given the Saginaw offer. This conclusion would be just as true, in the reduction-in-force context, if the plaintiff had not been given any relocation allowance.

The plaintiff has failed to put forth evidence to satisfy the second element of the prima facie case. If the plaintiff had shown that he was adversely affected, he would still have to "produce evidence for which a factfinder might reasonably conclude that the employer intended to discriminate in making the employment decision at issue." *Ayala*, 831 F.2d at 1319. "To fulfill the forth requirement, the plaintiff *must show* that the employer has not treated age in a neutral fashion and that, on the evidence presented, a jury could reasonably conclude that the defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or that the defendant regarded age as a negative factor." *Id.* (emphasis added). The plaintiff cannot possibly satisfy this mandatory requirement, in view of the fact that he was offered relocation by the defendant. It should be remembered that the factfinder, even in age discrimination cases, is only required to draw reasonable inferences from the evidence. The court "is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matters, but only reasonable ones." *Matthews*, 769 F.2d at 1218 (emphasis in original), *quoting Parker v. Federal National Mortgage Ass'n.*, 741 F.2d 975, 980 (7th Cir.1984).

The plaintiff has not produced evidence from which a reasonable conclusion could be drawn that the defendant intended to discriminate in offering him the Saginaw, Michigan district. The undisputed facts make this clear. First, many of the defendant's employees, who were younger than the plaintiff in this case, were offered no relocation at all. The second, there is nothing about the Saginaw, Michigan district that somehow amounts to a kiss of death. That Saginaw was not a graveyard for old employees is substantiated by the fact that when the plaintiff rejected the offer, the defendant extended it to the next youngest displaced district sales manager, Mr. Oberschelp, age 24. After Overschelp left, Saginaw was offered to Levitt, age 27. Thirdly, sales managers in the Great Lakes region who were offered comparable employ-

ment with the same relocation terms as the plaintiff included Mr. Daquila (age 35), Mr. Mitchell (age 46), Mr. Oberschelp (age 24) and Mr. Brundage (age 36). Forty percent of the relocation offers were to individuals within the protected age group, and 60% of the offers were to younger employees. Statistical evidence in age discrimination cases is generally not of significance unless the disparities in treatment are quite large. *Matthews,* 769 F.2d at 1221. The statistics in this case do not raise an inference of discriminatory intent.

The plaintiff has failed to establish the second and fourth elements of the prima facie case. Not only did the plaintiff fail to establish these elements, it seems to the court that in his attempt to establish these elements he only highlighted the weaknesses of his case. It is an undisputed fact that the plaintiff, for a number of years prior to the 1985 reduction-in-force, was unwilling to leave the Fort Wayne area. One cannot help but wonder whether the plaintiff is attempting to use the Age Discrimination in Employment Act as a vehicle for forcing the defendant to keep him employed in the city of his choice. But the Age Discrimination in Employment Act is only designed to prevent age discrimination; it was not designed as a tool to coerce employers to accomodate the whims of employees.

ii. *Defendant's Legitimate Nondiscriminatory Reason*

■ Assuming *arguendo* that the plaintiff had established the prima facie case of discrimination, the burden of production falls on the defendant to articulate a lawful, nondiscriminatory reason for the action, for offering the relocation package in Saginaw, Michigan. *Ayala,* 831 F.2d at 319. In this case the relocation package was offered to the plaintiff because his district had been eliminated. He was required to live in Saginaw, Michigan, like all other district managers *at that time* because it was important to the defendant that sales managers be in close proximity to the districts they manage. He was offered the same relocation package as other district managers *at that time* which, because of the reduction-in-force, was admit-

tedly not as great as it had been in the past. The defendant has clearly articulated a legitimate nondiscriminatory reason for the offer to Saginaw, Michigan and for the terms of the offer.

The burden of production now falls back on the plaintiff to show "that the proffered reasons are pretext, by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Id.* at 1319, *quoting LaMontagne,* 750 F.2d at 1409. For the reasons discussed above, the court is convinced that the plaintiff could not possibly show that a discriminatory reason more likely motivated the employer or that the proffered explanation is unworthy of credence. Therefore, assuming arguendo that the plaintiff had established a prima facie case, the defendant has clearly articulated legitimate nondiscriminatory reasons for its actions which the plaintiff cannot show are pretextual.

B. *Denial of Special Early Retirement*

■ The plaintiff's second claim of age discrimination is just as untenable as the first. After refusing the Saginaw offer during the 1985 reduction-in-force, the plaintiff requested that he be given special early retirement. Plaintiff was 54 years old at the time. The evidence is undisputed that special early retirement was only given to those who were eligible: to those who had served 10 or more years, who were at least 55 years old, and whose retirement would open up a position for an indispensible person who would otherwise be eliminated, or whose position had been eliminated with no comparable slot available. It is undisputed that the plaintiff was ineligible for special early retirement because he was only 54 years old at the time, and because there was no other district sales manager so indispensible that displacement of the employee was warranted.

It seems to the court that the biggest obstacle to this claim is the fact that the plaintiff was too young for special early retirement. The plaintiff has cited no

cases where an employee maintained a successful age discrimination case, in the context of an early retirement claim, where the employee was too young to qualify for early retirement. As the Seventh Circuit recently stated, "The purpose of the ADEA is 'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1428 (7th Cir.1986). It would certainly be an anomaly if an employer was held liable under the Age Discrimination in Employment Act for failing to offer special early retirement to an employee who was too young to qualify. Such a result would not serve the purpose of the Act, would make little sense, and would find no support in the case law. The plaintiff cannot show age discrimination where the employer denied special early retirement because he was too young.

In *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir.1987), Judge Easterbrook affirmed the district court's grant of summary judgment in favor of an employer, holding that the plaintiffs had failed to establish a prima facie case of age discrimination. In *Henn*, the employer, the National Geographic Society, had decided to reduce the number of employees selling ads due to a decline in advertising. *Id.* at 826. The Society offered ad salesmen over the age of 55 the option of early retirement. *Id.* Four employees who took the offer of early retirement filed an age discrimination suit, contending that their separation from employment violated the ADEA. The district court granted summary judgment, concluding that early retirement "violates the ADEA only if the alternative is 'constructive discharge'—that is, working conditions too onerous or demeaning that the employee has effectively been fired in place and compelled to leave." *Id.* at 826. Having determined that the plaintiffs could not show constructive discharge, the district court concluded that the terms of early retirement could not violate the ADEA. The Seventh Circuit affirmed and

Judge Easterbrook wrote that, "Only a constructive discharge, where an actual discharge would violate the ADEA, supports a claim [that early retirement violates the ADEA]." *Id.* The court went on to hold that the reasonable inferences from the record would not allow a jury to infer that the plaintiffs would have been fired had they turned down the offer of early retirement, "and without such a constructive discharge they cannot undo their choice to retire." *Id.* at 830.

In *Henn*, the court explicitly rejected the Second Circuit's position in *Paolillo v. Dresser Industries, Inc.*, 813 F.2d 583 (2d Cir.1987), which holds that every retirement under an early retirement plan creates a prima facie case of age discrimination, and that the employer must show both that the details of the plan have solid business justifications and that each decision to retire is voluntary. *See Henn*, 819 F.2d at 826. The court did not reach the plaintiffs' prima facie case because the plaintiffs had failed to establish a constructive discharge. The only difference between *Henn* and this case is that the plaintiffs in *Henn* had chosen the option of early retirement. But that difference is insignificant, since the plaintiffs in *Henn* could argue that they were treated adversely under the plan because of their age. *Henn*, 819 F.2d at 827. In other words, the fact that the plaintiffs in *Henn* had accepted early retirement did not bar their age discrimination claim. The court didn't reach the prima facie stage of their claim because they had failed to establish constructive discharge. To the extent that the plaintiff in this case has an age discrimination claim based on the defendant's refusal of special early retirement, that claim is precluded by the fact that the plaintiff, like the plaintiff in *Henn*, was not constructively discharged. For that reason, the defendant's motion for summary judgment is granted.

"An employee excluded from the early retirement plan (as in *Cipriano*, which excluded employees 60 and over), or treated adversely under it (as in *Patterson*, dealing with a plan whose benefits dimished with age), has stated a [prima facie] claim of

discrimination." *Henn,* 819 F.2d at 827. Assuming *arguendo* that the plaintiff did not face the problem discussed in the foregoing paragraphs, he would then be required to establish a prima facie case of age discrimination based upon his ineligibility for special early retirement. He could not claim that he was treated adversely under the plan since he was not a part of the plan. He would, therefore, under *Henn,* have to argue that he was excluded from early retirement.

But there is a big difference between exclusion and ineligibility. In *Cipriano v. Board of Education of City School District,* 785 F.2d 51 (2d Cir.1986), a case to which Judge Easterbrook referred when discussing the requirements for a prima facie case, the employees who were excluded for early retirement were too old to be included in the plan. The difference is extremely significant. Unlike the plaintiff in this case, those employees would never become eligible for early retirement after passing age 60. They were excluded in the sense that nothing could be changed once they passed age 60 to give them a chance for early retirement benefits. But the plaintiff in this case, who was too young to qualify for special early retirement, did not have that problem. He simply had to wait until he was 55 to qualify for special early retirement. Had he waited another year he would have been within the guidelines, in terms of his age, and would have been eligible for special early retirement. So he was not excluded like the plaintiffs in *Cipriano,* but rather, was simply ineligible. The court does not think, therefore, that the plaintiff could establish a prima facie case by arguing that he was excluded from early retirement.

The Seventh Circuit recently decided an age case where three professors claimed that an early retirement program discriminated· against professors over age 65. *Karlen v. City Colleges of Chicago,* 837 F.2d 314 (7th Cir.1988). Judge Posner noted the distinction between exclusion and ineligibility.

But no one suffered [as a result of early retirement] except employees under 55, who were not eligible for the program (more about them shortly).

\* \* \* \* \* \*

[A]n early retirement plan that treats you better the older you are is not suspect under the Age Discrimination in Employment Act. Compare *Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1427–29 (7th Cir.1986). Title VII protects whites and men as well as blacks and women, but the Age Discrimination in Employment Act does not protect the young as well as the old, or even, we think, the younger *against* the older. The protected zone begins at age 40, but if on that account workers 40 or older but younger than the age of eligibility for early retirement could complain—workers 40 to 54 in *Henn*—early retirement plans would effectively be outlawed, and that was not the intent of the framers of the Age Discrimination in Employment Act. The *reductio ad absurdum* of the reasoning which views early retirement plans with suspicion would be to view permitting workers to retire when they reach the age of 65 as a form of discrimination against workers aged 40 to 64. Then the employer could be confident of escaping liability under the Age Discrimination in Employment Act only by allowing retirement at age 40!

*Karlen,* at 318 (emphasis in original). Pursuant to *Karlen,* the plaintiff in this case has no claim for special early retirement—he just was not old enough.

If the plaintiff could establish a prima facie case because he was ineligible (too young) as opposed to excluded (too old), then every potential plaintiff could create a presumption of discrimination upon denial of special early retirement, requiring employers to show a sound business purpose for the structure of a plan, as well as the absence of "subterfuge," under § 4(f)(2), 29 U.S.C. § 623(f)(2) (1982). *See, e.g., Henn,* 819 F.2d at 827. *See also* 29 C.F.R. § 860.120(a)(1) (discussing the function of § 4(f)(2)); *Cipriano, supra* (discussing the burdens of proof under § 4(f)(2)); *EEOC v. Borden's, Inc.,* 724 F.2d 1390, 1395–96 (9th Cir.1984) (discussing legislative history of

§ 4(f)(2)). That would be a manifestly unreasonable burden to place upon employers. Assuming arguendo, however, that the plaintiff in this case had established a prima facie case, the defendant has established a competent defense under § 4(f)(2). Indeed, the plaintiff has not even argued that there was no sound purpose for requiring employees to be at least 55 before becoming eligible for special early retirement. Neither has the plaintiff argued that this requirement was a subterfuge for age discrimination. Indeed, it would be difficult to do so in view of the many early retirement plans which begin at age 55. *See, e.g., Karlen, supra; Henn, supra; Cipriano, supra.* Accordingly, if the plaintiff had established a prima facie case, the defendant has articulated a competent defense to this claim.

## C. Denial of Promotion to City Sales Manager's Position in Indianapolis

The plaintiff's last claim is that the defendant discriminated against him because of his age when it awarded the Indianapolis city sales area to Charles Brundage. It should be remembered that after the plaintiff turned down the Saginaw district he asked Assistant Zone Manager Mike Storm, who had related that offer, to try and work out a mutual agreement to get him special early retirement. *See Factual Background, supra,* pp. 1371–1372. After learning that he was not qualified for special early retirement, the plaintiff inquired about the Indianapolis city sales area, which had been upgraded to a city sales manager's position. At that time, which was before Brundage had actually been selected for the position, the plaintiff was told by Storm that he was not qualified for the Indianapolis city sales manager's position "based on the current performance and past performance and sales as indicated by performance reviews." *See Factual Background, supra,* pp. 1371–1372. The position was ultimately awarded to Brundage, 36 years old, who was considered well qualified because he had managed dealerships in Indianapolis for Ford Motor Company for 10 years. The plaintiff contends that the defendant discriminated against him because of his age when it awarded the city sales manager's position to Brundage.

### i. The Prima Facie Case

■ The defendant concedes that the plaintiff can probably make out a prima facie case of age discrimination, since the Indianapolis city sales manager's position went to a younger employee, Mr. Brundage, who is not in the protected category. The court is not so sure. The plaintiff was not qualified for the Indianapolis city sales manager's position. In failure to promote cases, a prima facie case consists of a showing that: (1) the plaintiff belongs to the group protected by the relevant statute (age 40 to 70); (2) the plaintiff was qualified for the position in question; (3) the plaintiff was not promoted; and (4) a person not of the protected group was selected. *See Furr v. AT & T Technologies,* 824 F.2d 1537 (10th Cir.1987); *Cuddy v. Carmen,* 762 F.2d 119, 122 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985); *Krodel v. Young,* 748 F.2d 701, 705 (D.C.Cir.1984). *See also Owens v. Freeman United Coal Min.,* 649 F.Supp. 1565 (S.D.Ill.1986) (plaintiff must be qualified for rehire to establish prima facie case under Age Discrimination in Employment Act). This court therefore believes that the plaintiff has to show that he was qualified in order to establish a prima facie case based upon the defendant's failure to promote him to the city sales manager's position.[13]

As this court has previously noted, establishing a prima facie case of discrimination should not be onerous. *Beard v. Whitley Co. REMC,* 656 F.Supp. 1461, 1473 (N.D. Ind.1987), *aff'd,* 840 F.2d 405 (7th Cir.1988). Proof of a prima facie case merely entitles

---

**13.** The defendant correctly points out that this is a promotion case. The reorganized Indianapolis city district was upgraded after the 1985 reorganization to a city sales manager's position. Not only the boundaries changed, the manager's position was upgraded from labor grade 10 to labor grade 11.

the plaintiff to an inference of discrimination and is not a factual finding to that effect. *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 512 (7th Cir.1986). On the other hand, as this court noted in *Beard,* establishing a prima facie case entitles the plaintiff to an inference of discrimination, requiring the employer to offer some legitimate nondiscriminatory explanation, which then ultimately moves the court to the issue of pretext and questions of motive and intent. *Beard,* 656 F.Supp. at 1473. If a plaintiff is not qualified for the position to which he seeks to be promoted, this court will not infer discrimination. The most obvious reason for failure to promote an employee is the employee's qualifications or lack thereof. Accordingly, the court will consider plaintiff's qualifications for the Indianapolis city sales manager's position as a part of the prima facie case.

The defendant argues that while the plaintiff was qualified as a district sales manager, he was not qualified as a city sales manager. According to the defendant, there are no genuine issues of material fact with respect to the plaintiff's lack of qualifications for the city sales manager's position. The court has spent a great deal of time reviewing the evidence which has been submitted in support of and in opposition to this motion and is convinced that there are no genuine issues of material fact with respect to the plaintiff's lack of qualifications for the city sales manager's position in Indianapolis. While the plaintiff was clearly qualified as a district sales manager, he was not qualified as a city sales manager.

The plaintiff argues that he was well qualified to be a city sales manager, in part because he was qualified as a district sales manager. It is a fact that the plaintiff worked for approximately 10 years as district sales manager with the defendant. *See Factual Background, supra,* at 1373. It is also a fact that the plaintiff had worked at his father's Dodge–Chrysler dealership in Portland, Indiana for a period of years, and as an auditor for Chrysler in 1962. *See Factual Background, supra,* p. 1369. It is also true that the plaintiff worked as a district sales manager for Chrysler Corporation in an area surrounding Fort Wayne, Indiana. And the court agrees with the plaintiff that he had extensive experience with the defendant as a district sales manager in the Fort Wayne area, and in surrounding areas for short periods of time, for the entirety of his employment with the defendant. *See Factual Background, supra,* pp. 1369–1370. But all of this only esablishes a fact which the defendant readily concedes—the fact that the plaintiff was qualified as a district sales manager.

This fact would be very important if the evidence showed that a district sales manager's position was the same as a city sales manager's position; but that is not (contrary to the plaintiff's strained arguments) what the evidence shows. It is true, as the plaintiff points out, that district sales managers and city sales managers have a number of the same responsibilities and would require a number of the same qualifications. But it cannot be disputed that a city sales manager's position is different in many respects from a district sales manager's position. District sales managers service areas with small to medium sized dealerships, while city sales managers service major metropolitan areas with large dealerships. As noted earlier, a district sales manager's job is classified as labor grade 10, while a city sales manager's job is classified as labor grade 11. The reason for the classification, which entitles city sales managers to higher pay, is that city sales managers are entrusted with larger volumes of business and must be adept at marketing techniques unique to large, metropolitan dealerships. *See Factual Background, supra,* p. 1370. The court therefore concludes that there are no genuine issues of material fact with respect to this important point: a city sales manager's position was a different position from the district sales manager's position, requiring different qualifications.

In his attempt to show that he was qualified for the city sales manager's position, the plaintiff points to his evaluations and his work history with the defendant. As the court noted in the *Factual Back-*

*ground, supra,* plaintiff's evaluations with the defendant (especially on the important issue of promotability) tapered off during the last years of his employment. It is true that the plaintiff was considered a candidate for promotion to a number of positions, but those positions had nothing to do with managing a city sales area. *See Factual Background, supra,* p. 1374. It cannot be disputed that during the latter years of his employment with the defendant he was considered non-promotable because he lacked aggressiveness, commitment and ambition, and was unwilling to relocate. The plaintiff was qualified as a district sales manager, but he was not qualified as a city sales manager and he has not raised any genuine issues of material fact with respect to this issue. *See Factual Background, supra,* p. 1375 n. 11.

Based on the foregoing and the court's *Factual Background, supra,* the court concludes that the plaintiff failed to show that he was qualified for the Indianapolis city sales manager's position. Plaintiff did not, therefore, establish a prima facie case of discrimination and the defendant is entitled to summary judgment.

### ii. *Defendant's Legitimate Nondiscriminatory Reason*

■ Assuming *arguendo,* however, that the plaintiff had established a prima facie case, the burden of production would then shift to the defendant to articulate a legitimate, nondiscriminatory reason for not promoting the plaintiff. *Dale,* 797 F.2d at 462. If the employer carries this burden, then the plaintiff must prove by a preponderance of the evidence that the employer's explanation was a mere pretext for discrimination. *Matthews,* 769 F.2d at 1217. In this case, the defendant has articulated a legitimate, nondiscriminatory reason for not promoting the plaintiff to the Indianapolis city sales manager's position: the defendant did not believe that the plaintiff was qualified for that position. The plaintiff now has the burden to show that the defendant's proffered explanation is a mere pretext for discrimination. In this context, pretext means "pretext for discrimination," and not merely that the employer's articu-

lated reason for its action is untrue. *See Pollard,* 824 F.2d at 559. If the evidence shows, without a dispute of material fact, that the defendant made its decision because it believed that the plaintiff was unqualified, then this court cannot reexamine the defendant's business decision. *Id. See also Graefenhain,* 827 F.2d at 20.

It is quite clear that the plaintiff considers himself much better qualified to manage the Indianapolis city sales area than Mr. Brundage. It is just as clear that the defendant considers Brundage more qualified because of his 10 years' experience with Ford Motor Company in Indianapolis. Of course, the plaintiff may disagree with the defendant that experience in Indianapolis with Ford Motor Company is important, but that is a disagreement over a business decision. There is no dispute about the fact that the defendant did believe Brundage was more qualified. *See Factual Background, supra,* pp. 1372–1373. Moreover, and very importantly, there is no dispute that the plaintiff was told by representatives of the defendant that he was not qualified to manage the Indianapolis city sales area. *See Factual Background, supra,* pp. 1371–1372.

The defendant's decision not to promote plaintiff was based not only his inexperience with city sales managing, but also on his evaluations. In this regard, two undisputed facts emerge. First, the plaintiff's evaluations in his later years with the defendant showed that he was not promotable to a city sales manager's position. Second, the facts show that the defendant relied on these evaluations when it decided not to promote him to the city sales manager's position and that it communicated that reliance to the plaintiff. The defendant's reliance on the evaluations is also a legitimate, nondiscriminatory reason for its decision and the plaintiff has raised no genuine issues of material fact which suggest that the defendant did not rely on these evaluations in making its decision.

At best, the plaintiff has raised a "metaphysical doubt" with respect to the issue of pretext. But *Matsushita* teaches that a metaphysical doubt is insufficient to avoid

summary judgment. *Matsushita, supra. See also Beard v. Whitley Co. REMC,* 840 F.2d 405 (7th Cir.1988). As noted earlier, *see Summary Judgment Standards, supra,* the nonmoving party in a summary judgment motion must come forward with specific facts showing that there is a genuine issue for trial. This case is so one-sided that the defendant must prevail as a matter of law. *Anderson,* 106 S.Ct. at 2512. Accordingly, the defendant's motion for summary judgment on the plaintiff's third claim is hereby granted.

## IV.

*Plaintiff's Failure to Mitigate Damages*

■■■■■ A plaintiff who prevails in an ADEA case must use reasonable care and diligence in seeking reemployment to mitigate damages. *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1345 (9th Cir.1987); *EEOC v. Community Unit School District No. 9,* 642 F.Supp. 902, 907 (S.D.Ill.1986). The defendant bears the burden of showing that there were suitable positions available and that the plaintiff failed to use reasonable care in seeking them. *Jackson v. Shell Oil Co.,* 702 F.2d 197, 201 (9th Cir.1983). *See also Orzel v. City of Wauwatosa Fire Dept.,* 697 F.2d 743 (7th Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983). Thus, even a plaintiff who establishes age discrimination cannot recover those damages which have been mitigated by reasonable care and diligence.

■■■■ The defendant has met its burden of showing that there was a suitable position available. It is undisputed that the Saginaw position was offered to the plaintiff and rejected. The court realizes that the standard relative to the constructive discharge issue is distinguishable from the standard of reasonableness applicable to the mitigation issue. But the court holds, on the facts of this case, not only that the offer of the Saginaw position did not amount to constructive discharge, but also, that the plaintiff's refusal to take the position was unreasonable, constituting a breach of the plaintiff's duty to mitigate

damages. The Saginaw position was identical to the position which the plaintiff held in Fort Wayne. The plaintiff would receive the same pay and would have the same job title. The plaintiff breached his duty to mitigate damages when he unreasonably refused to accept the Saginaw offer.

*Spagnuolo v. Whirlpool Corp.,* 717 F.2d 114 (4th Cir.1983), cited by the plaintiff, is distinguishable from this case. In *Spagnuolo,* the court held that the plaintiff had not breached his duty to mitigate damages, when he refused to accept employment located an unreasonable distance from his home. *Id.* at 119. But the court specifically noted that the new employment would require the plaintiff to spend 75% of his time on the road, as opposed to the 25% previously spent in his old job. *Id.* at 119 n. 1. The offer which the plaintiff in *Spagnuolo* turned down, therefore, was an unreasonable offer for a job that was significantly different from his original job. The plaintiff in this case was offered the same job with the same pay. Beyond that, the court noted in *Spagnuolo,* that the defendant did not normally transfer its employees to new cities. *Id.* at 118. The defendant in this case regularly transferred its district managers to new locations, as is easily seen in the number of changes which were made during the 1985 reduction-in-force. Thus, *Spagnuolo* is distinguishable from this case because the offer of employment in *Spagnuolo* was unreasonable.

## V.

*Conclusion*

The plaintiff failed to raise a prima facie case of age discrimination on any of his three claims. Had he done so, the defendant had legitimate, nondiscriminatory reasons for all of its actions with respect to all three claims, which the plaintiff could not show were pretextual. In this regard, no genuine issues of material fact were raised by the plaintiff to preclude summary judgment. Beyond that, the plaintiff failed to mitigate his damages by accepting a reasonable offer of employment in Saginaw, Michigan. Accordingly, the defendant's

motion for summary judgment is hereby GRANTED.