GENERAL DYNAMICS LAND SYSTEMS, INC. *v.*
CLINE ET AL.

No. 02–1080.   Argued November 12, 2003—Decided February 24, 2004

582

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, *post*, p. 601. THOMAS, J., filed a dissenting opinion, in which KENNEDY, J., joined, *post*, p. 602.

*Donald B. Verrilli, Jr.,* argued the cause for petitioner. With him on the briefs were *Deanne E. Maynard, William J. Kilberg,* and *Craig C. Martin.*

*Mark W. Biggerman* argued the cause for respondents. With him on the brief were *Erin Stottlemyer Gold, E. Bruce Hadden,* and *Joanne C. Brant.*

*Acting Solicitor General Clement* argued the cause for the United States et al. as *amici curiae* urging affirmance. With him on the brief were *Irving L. Gornstein, Carolyn L. Wheeler, Lorraine C. Davis, Robert J. Gregory,* and *Susan R. Oxford.**

JUSTICE SOUTER delivered the opinion of the Court.

The Age Discrimination in Employment Act of 1967 (ADEA or Act), 81 Stat. 602, 29 U. S. C. § 621 *et seq.*, forbids discriminatory preference for the young over the old. The question in this case is whether it also prohibits favoring the old over the young. We hold it does not.

I

In 1997, a collective-bargaining agreement between petitioner General Dynamics and the United Auto Workers eliminated the company's obligation to provide health benefits to subsequently retired employees, except as to then-current workers at least 50 years old. Respondents (collectively, Cline) were then at least 40 and thus protected by the Act, see 29 U. S. C. § 631(a), but under 50 and so without promise of the benefits. All of them objected to the new terms, although some had retired before the change in order to get

---

*Briefs of *amici curiae* urging reversal were filed for AARP by *Laurie A. McCann, Daniel B. Kohrman,* and *Melvin Radowitz;* for the American Federation of Labor and Congress of Industrial Organizations et al. by *Jonathan P. Hiatt, James B. Coppess, Daniel W. Sherrick, Michael F. Saggau,* and *Laurence Gold;* for the Central States, Southeast and Southwest Areas Health and Welfare Fund by *Thomas C. Nyhan, James P. Condon,* and *John J. Franczyk, Jr.;* for the Equal Employment Advisory Council et al. by *Ann Elizabeth Reesman, Daniel V. Yager, Katherine Y. K. Cheung, Stephen A. Bokat, Robin S. Conrad,* and *Ellen Dunham Bryant;* for the ERISA Industry Committee by *Caroline M. Brown* and *John M. Vine;* and for the National Education Association by *Robert H. Chanin, John M. West,* and *Douglas L. Greenfield.*

the prior advantage, some retired afterwards with no benefit, and some worked on, knowing the new contract would give them no health coverage when they were through.

Before the Equal Employment Opportunity Commission (EEOC or Commission) they claimed that the agreement violated the ADEA, because it "discriminate[d against them] . . . with respect to . . . compensation, terms, conditions, or privileges of employment, because of [their] age," § 623(a)(1). The EEOC agreed, and invited General Dynamics and the union to settle informally with Cline.

When they failed, Cline brought this action against General Dynamics, combining claims under the ADEA and state law. The District Court called the federal claim one of "reverse age discrimination," upon which, it observed, no court had ever granted relief under the ADEA. 98 F. Supp. 2d 846, 848 (ND Ohio 2000). It dismissed in reliance on the Seventh Circuit's opinion in *Hamilton* v. *Caterpillar Inc.*, 966 F. 2d 1226 (1992), that "the ADEA 'does not protect . . . the younger *against* the older,'" *id.*, at 1227 (quoting *Karlen* v. *City Colleges of Chicago*, 837 F. 2d 314, 318 (CA7), cert. denied *sub nom. Teachers* v. *City Colleges of Chicago*, 486 U. S. 1044 (1988)).

A divided panel of the Sixth Circuit reversed, 296 F. 3d 466 (2002), with the majority reasoning that the prohibition of § 623(a)(1), covering discrimination against "any individual . . . because of such individual's age," is so clear on its face that if Congress had meant to limit its coverage to protect only the older worker against the younger, it would have said so. *Id.*, at 472. The court acknowledged the conflict of its ruling with earlier cases, including *Hamilton* and *Schuler* v. *Polaroid Corp.*, 848 F. 2d 276 (1988) (opinion of Breyer, J.), from the First Circuit, but it criticized the cases going the other way for paying too much attention to the "hortatory, generalized language" of the congressional findings incorporated in the ADEA. 296 F. 3d, at 470. The Sixth Circuit

drew support for its view from the position taken by the EEOC in an interpretive regulation.[1]  *Id.*, at 471.

Judge Cole, concurring, saw the issue as one of plain meaning that produced no absurd result, although he acknowledged a degree of tension with *O'Connor* v. *Consolidated Coin Caterers Corp.*, 517 U. S. 308 (1996), in which this Court spoke of age discrimination as giving better treatment to a "'substantially younger'" worker.   296 F. 3d, at 472.   Judge Williams dissented in preference for *Hamilton* and the consensus of the federal courts, thinking it "obvious that the older a person is, the greater his or her needs become."   296 F. 3d, at 476.

We granted certiorari to resolve the conflict among the Circuits, 538 U. S. 976 (2003), and now reverse.

## II

The common ground in this case is the generalization that the ADEA's prohibition covers "discriminat[ion] . . . because of [an] individual's age," 29 U. S. C. § 623(a)(1), that helps the younger by hurting the older.   In the abstract, the phrase is open to an argument for a broader construction, since reference to "age" carries no express modifier and the word could be read to look two ways.   This more expansive possible understanding does not, however, square with the natural reading of the whole provision prohibiting discrimination, and in fact Congress's interpretive clues speak almost unanimously to an understanding of discrimination as directed against workers who are older than the ones getting treated better.

Congress chose not to include age within discrimination forbidden by Title VII of the Civil Rights Act of 1964, § 715,

---

[1] 29 CFR § 1625.2(a) (2003) ("[I]f two people apply for the same position, and one is 42 and the other 52, the employer may not lawfully turn down either one on the basis of age, but must make such decision on the basis of some other factor").   We discuss this regulation at greater length, *infra*, at 599–600.

78 Stat. 265, being aware that there were legitimate reasons as well as invidious ones for making employment decisions on age. Instead it called for a study of the issue by the Secretary of Labor, *ibid.*, who concluded that age discrimination was a serious problem, but one different in kind from discrimination on account of race.[2] The Secretary spoke of disadvantage to older individuals from arbitrary and stereotypical employment distinctions (including then-common policies of age ceilings on hiring), but he examined the problem in light of rational considerations of increased pension cost and, in some cases, legitimate concerns about an older person's ability to do the job. Wirtz Report 2. When the Secretary ultimately took the position that arbitrary discrimination against older workers was widespread and persistent enough to call for a federal legislative remedy, *id.*, at 21–22, he placed his recommendation against the background of common experience that the potential cost of employing someone rises with age, so that the older an employee is, the greater the inducement to prefer a younger substitute. The report contains no suggestion that reactions to age level off at some point, and it was devoid of any indication that the Secretary had noticed unfair advantages accruing to older employees at the expense of their juniors.

Congress then asked for a specific proposal, Fair Labor Standards Amendments of 1966, § 606, 80 Stat. 845, which the Secretary provided in January 1967, 113 Cong. Rec. 1377 (1967); see also Public Papers of the Presidents, Lyndon

---

[2] That report found that "[e]mployment discrimination because of race is identified . . . with . . . feelings about people entirely unrelated to their ability to do the job. There is *no* significant discrimination of this kind so far as older workers are concerned. The most closely related kind of discrimination in the non-employment of older workers involves their rejection because of assumptions about the effect of age on their ability to do a job *when there is in fact no basis for these assumptions.*" Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment 2 (June 1965) (hereinafter Wirtz Report) (emphasis in original).

B. Johnson, Vol. 1, Jan. 23, 1967, p. 37 (1968) (message to Congress urging that "[o]pportunity . . . be opened to the many Americans over 45 who are qualified and willing to work"). Extensive House and Senate hearings ensued. See Age Discrimination in Employment: Hearings on H. R. 3651 et al. before the General Subcommittee on Labor of the House Committee on Education and Labor, 90th Cong., 1st Sess. (1967) (hereinafter House Hearings); Age Discrimination in Employment: Hearings on S. 830 and S. 788 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess. (1967) (hereinafter Senate Hearings). See generally *EEOC* v. *Wyoming*, 460 U. S. 226, 229–233 (1983).

The testimony at both hearings dwelled on unjustified assumptions about the effect of age on ability to work. See, *e. g.*, House Hearings 151 (statement of Rep. Joshua Eilberg) ("At age 40, a worker may find that age restrictions become common . . . . By age 45, his employment opportunities are likely to contract sharply; they shrink more severely at age 55 and virtually vanish by age 65"); *id.*, at 422 (statement of Rep. Claude Pepper) ("We must provide meaningful opportunities for employment to the thousands of workers 45 and over who are well qualified but nevertheless denied jobs which they may desperately need because someone has arbitrarily decided that they are too old"); Senate Hearings 34 (statement of Sen. George Murphy) ("[A]n older worker often faces an attitude on the part of some employers that prevents him from receiving serious consideration or even an interview in his search for employment").[3]  The hearings specif-

---

[3] See also House Hearings 449 (statement of Rep. James A. Burke) ("Discrimination arises for [the older job seeker] because of assumptions that are made about the effects of age on performance"); Senate Hearings 179 (statement of Dr. Harold L. Sheppard) ("[O]ne of the underlying conditions for this upward trend in unemployment rates for a given group of so-called older workers over a period of time . . . is related to the barrier of age discrimination"); *id.*, at 215 (statement of Sen. Harrison A. Williams)

ically addressed higher pension and benefit costs as heavier drags on hiring workers the older they got. See, *e. g.*, House Hearings 45 (statement of Norman Sprague) (Apart from stereotypes, "labor market conditions, seniority and promotion-from-within policies, job training costs, pension and insurance costs, and mandatory retirement policies often make employers reluctant to hire older workers"). The record thus reflects the common facts that an individual's chances to find and keep a job get worse over time; as between any two people, the younger is in the stronger position, the older more apt to be tagged with demeaning stereotype. Not surprisingly, from the voluminous records of the hearings, we have found (and Cline has cited) nothing suggesting that any workers were registering complaints about discrimination in favor of their seniors.

Nor is there any such suggestion in the introductory provisions of the ADEA, 81 Stat. 602, which begins with statements of purpose and findings that mirror the Wirtz Report and the committee transcripts. *Id.*, § 2. The findings stress the impediments suffered by "older workers . . . in their efforts to retain . . . and especially to regain employment," *id.*, § 2(a)(1); "the [burdens] of arbitrary age limits regardless of potential for job performance," *id.*, § 2(a)(2); the costs of "otherwise desirable practices [that] may work to the disadvantage of older persons," *ibid.;* and "the incidence of unemployment, especially long-term unemployment[, which] is, relative to the younger ages, high among older workers," *id.*, § 2(a)(3). The statutory objects were "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and]

("'Unfavorable beliefs and generalizations about older persons have grown up and have been translated into restrictive policies and practices in hiring new employees which bar older jobseekers from employment principally because of age'" (quoting earlier report of Senate Special Committee on Aging)).

to help employers and workers find ways of meeting problems arising from the impact of age on employment." *Id.*, § 2(b).

In sum, except on one point, all the findings and statements of objectives are either cast in terms of the effects of age as intensifying over time, or are couched in terms that refer to "older" workers, explicitly or implicitly relative to "younger" ones. The single subject on which the statute speaks less specifically is that of "arbitrary limits" or "arbitrary age discrimination." But these are unmistakable references to the Wirtz Report's finding that "[a]lmost three out of every five employers covered by [a] 1965 survey have in effect age limitations (most frequently between 45 and 55) on new hires which they apply without consideration of an applicant's other qualifications." Wirtz Report 6. The ADEA's ban on "arbitrary limits" thus applies to age caps that exclude older applicants, necessarily to the advantage of younger ones.

Such is the setting of the ADEA's core substantive provision, § 4 (as amended, 29 U. S. C. § 623), prohibiting employers and certain others from "discriminat[ion] . . . because of [an] individual's age," whenever (as originally enacted) the individual is "at least forty years of age but less than sixty-five years of age," § 12, 81 Stat. 607.[4] The prefatory provisions and their legislative history make a case that we think is beyond reasonable doubt, that the ADEA was concerned

---

[4] In 1978, Congress changed the upper age limit to 70 years, Pub. L. 95–256, § 3(a), 92 Stat. 189, and then struck it entirely in 1986, Pub. L. 99–592, § 2(c)(1), 100 Stat. 3342. The President transferred authority over the ADEA from the Department of Labor to the EEOC in 1978. Reorg. Plan No. 1 of 1978, 5 U. S. C. App. § 2, p. 206. Congress has also made other changes, including extending the ADEA to government employees (state, local, and federal), Pub. L. 93–259, 88 Stat. 74–75 (amending 29 U. S. C. § 630(b) and adding § 633a), and clarifying that it extends, with certain exceptions, to employee benefits, Pub. L. 101–433, 104 Stat. 978 (amending among other provisions 29 U. S. C. § 630(*l*)).

to protect a relatively old worker from discrimination that works to the advantage of the relatively young.

Nor is it remarkable that the record is devoid of any evidence that younger workers were suffering at the expense of their elders, let alone that a social problem required a federal statute to place a younger worker in parity with an older one. Common experience is to the contrary, and the testimony, reports, and congressional findings simply confirm that Congress used the phrase "discriminat[ion] . . . because of [an] individual's age" the same way that ordinary people in common usage might speak of age discrimination any day of the week. One commonplace conception of American society in recent decades is its character as a "youth culture," and in a world where younger is better, talk about discrimination because of age is naturally understood to refer to discrimination against the older.

This same, idiomatic sense of the statutory phrase is confirmed by the statute's restriction of the protected class to those 40 and above. If Congress had been worrying about protecting the younger against the older, it would not likely have ignored everyone under 40. The youthful deficiencies of inexperience and unsteadiness invite stereotypical and discriminatory thinking about those a lot younger than 40, and prejudice suffered by a 40-year-old is not typically owing to youth, as 40-year-olds sadly tend to find out. The enemy of 40 is 30, not 50. See H. R. Rep. No. 805, 90th Cong., 1st Sess., 6 (1967) ("[T]estimony indicated [40] to be the age at which age discrimination in employment becomes evident"). Even so, the 40-year threshold was adopted over the objection that some discrimination against older people begins at an even younger age; female flight attendants were not fired at 32 because they were too young, *ibid.* See also Senate Hearings 47 (statement of Sec'y Wirtz) (lowering the minimum age limit "would change the nature of the proposal from an over-age employment discrimination measure"). Thus, the 40-year threshold makes sense as identifying a class re-

quiring protection against preference for their juniors, not as defining a class that might be threatened by favoritism toward seniors.[5]

The federal reports are as replete with cases taking this position as they are nearly devoid of decisions like the one reviewed here. To start closest to home, the best example is *Hazen Paper Co.* v. *Biggins,* 507 U. S. 604 (1993), in which we held there is no violation of the ADEA in firing an employee because his pension is about to vest, a basis for action that we took to be analytically distinct from age, even though it would never occur without advanced years. *Id.,* at 611–612. We said that "the very essence of age discrimination [is] for an older employee to be fired because the employer believes that productivity and competence decline with old age," *id.,* at 610, whereas discrimination on the basis of pension status "would not constitute discriminatory treatment on the basis of age [because t]he prohibited stereotype [of

---

[5] JUSTICE THOMAS, *post,* at 606–613 (dissenting opinion), charges our holding with unnaturally limiting a comprehensive prohibition of age discrimination to "the principal evil that Congress targeted," *post,* at 607, which he calls inconsistent with the method of *McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U. S. 273 (1976) (the Title VII prohibition of discrimination because of race protects whites), and *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U. S. 75 (1998) (the Title VII prohibition of discrimination because of sex protects men from sexual harassment by other men). His objection is aimed at the wrong place. As we discuss at greater length *infra,* at 596–598, we are not dealing here with a prohibition expressed by the unqualified use of a term without any conventionally narrow sense (as "race" or "sex" are used in Title VII), and are not narrowing such a prohibition so that it covers only instances of the particular practice that induced Congress to enact the general prohibition. We hold that Congress expressed a prohibition by using a term in a commonly understood, narrow sense ("age" as "relatively old age"). JUSTICE THOMAS may think we are mistaken, *post,* at 603–606, when we infer that Congress used "age" as meaning the antithesis of youth rather than meaning any age, but we are not making the particular mistake of confining the application of terms used in a broad sense to the relatively narrow class of cases that prompted Congress to address their subject matter.

the faltering worker] would not have figured in this decision, and the attendant stigma would not ensue," *id.*, at 612. And we have relied on this same reading of the statute in other cases. See, *e. g., O'Connor*, 517 U. S., at 313 ("Because the ADEA prohibits discrimination on the basis of age . . . the fact that a replacement is substantially younger than the plaintiff is a . . . reliable indicator of age discrimination"); *Western Air Lines, Inc.* v. *Criswell*, 472 U. S. 400, 409 (1985) ("[T]he legislative history of the ADEA . . . repeatedly emphasize[s that] the process of psychological and physiological degeneration caused by aging varies with each individual"). While none of these cases directly addresses the question presented here, all of them show our consistent understanding that the text, structure, and history point to the ADEA as a remedy for unfair preference based on relative youth, leaving complaints of the relatively young outside the statutory concern.

The Courts of Appeals and the District Courts have read the law the same way, and prior to this case have enjoyed virtually unanimous accord in understanding the ADEA to forbid only discrimination preferring young to old. So the Seventh Circuit held in *Hamilton,* and the First Circuit said in *Schuler,* and so the District Courts have ruled in cases too numerous for citation here in the text.[6] The very

---

[6] See *Lawrence* v. *Irondequoit,* 246 F. Supp. 2d 150, 161 (WDNY 2002) (following *Hamilton); Greer* v. *Pension Benefit Guaranty Corporation,* 85 FEP Cases 416, 419 (SDNY 2001) (noting unanimity of the courts); *Dittman* v. *General Motors Corp.-Delco Chassis Div.,* 941 F. Supp. 284, 286–287 (Conn. 1996) (alternative holding) (following *Hamilton); Parker* v. *Wakelin,* 882 F. Supp. 1131, 1140 (Me. 1995) ("The ADEA has never been construed to permit younger persons to claim discrimination against them in favor of older persons"); *Wehrly* v. *American Motors Sales Corp.,* 678 F. Supp. 1366, 1382 (ND Ind. 1988) (following *Karlen* v. *City Colleges of Chicago,* 837 F. 2d 314, 318 (CA7), cert. denied *sub nom. Teachers* v. *City Colleges of Chicago,* 486 U. S. 1044 (1988)). The only case we have found arguably to the contrary is *Mississippi Power & Light Co.* v. *Local Union*

strength of this consensus is enough to rule out any serious claim of ambiguity, and congressional silence after years of judicial interpretation supports adherence to the traditional view.[7]

## III

Cline and *amicus* EEOC proffer three rejoinders in favor of their competing view that the prohibition works both ways. First, they say (as does JUSTICE THOMAS, *post*, at 602–605) that the statute's meaning is plain when the word "age" receives its natural and ordinary meaning and the statute is read as a whole giving "age" the same meaning throughout. And even if the text does not plainly mean what they say it means, they argue that the soundness of their version is shown by a colloquy on the floor of the Senate involving Senator Yarborough, a sponsor of the bill that became the ADEA. Finally, they fall back to the position (fortified by JUSTICE SCALIA's dissent) that we should defer to the EEOC's reading of the statute. On each point, however, we think the argument falls short of unsettling our view of the natural meaning of the phrase speaking of discrimination, read in light of the statute's manifest purpose.

## A

The first response to our reading is the dictionary argument that "age" means the length of a person's life, with the

---

*Nos. 605 & 985, IBEW,* 945 F. Supp. 980, 985 (SD Miss. 1996), which allowed a claim objecting to a benefit given to individuals between 60 and 65 and denied to those outside that range, without discussing *Hamilton* or any of the other authority holding that the plaintiffs under 60 would lack a cause of action.

[7] Congress has not been shy in revising other judicial constructions of the ADEA. See *Public Employees Retirement System of Ohio* v. *Betts,* 492 U. S. 158, 167–168 (1989) (observing that the 1978 amendment to the ADEA "changed the specific result" of this Court's earlier case of *United Air Lines, Inc.* v. *McMann,* 434 U. S. 192 (1977)); H. R. Rep. No. 101–664, pp. 10–11, 34 (1990) (stating that Congress in 1978 had also disapproved *McMann's* reasoning, and that with the 1990 amendments it meant to overrule *Betts* as well).

phrase "because of such individual's age" stating a simple test of causation: "discriminat[ion] . . . because of [an] individual's age" is treatment that would not have occurred if the individual's span of years had been longer or shorter. The case for this reading calls attention to the other instances of "age" in the ADEA that are not limited to old age, such as 29 U. S. C. § 623(f), which gives an employer a defense to charges of age discrimination when "age is a bona fide occupational qualification." Cline and the EEOC argue that if "age" meant old age, § 623(f) would then provide a defense (old age is a bona fide qualification) only for an employer's action that on our reading would never clash with the statute (because preferring the older is not forbidden).

The argument rests on two mistakes. First, it assumes that the word "age" has the same meaning wherever the ADEA uses it. But this is not so, and Cline simply misemploys the "presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932). Cline forgets that "the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Ibid.;* see also *United States* v. *Cleveland Indians Baseball Co.*, 532 U. S. 200, 213 (2001) (phrase "wages paid" has different meanings in different parts of Title 26 U. S. C.); *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 343–344 (1997) (term "employee" has different meanings in different parts of Title VII). The presumption of uniform usage thus relents [8] when a word used

---

[8] It gets too little credit for relenting, though. "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333, 337

has several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing.

"Age" is that kind of word. As JUSTICE THOMAS (*post*, at 603) agrees, the word "age" standing alone can be readily understood either as pointing to any number of years lived, or as common shorthand for the longer span and concurrent aches that make youth look good. Which alternative was probably intended is a matter of context; we understand the different choices of meaning that lie behind a sentence like "Age can be shown by a driver's license," and the statement, "Age has left him a shut-in." So it is easy to understand that Congress chose different meanings at different places in the ADEA, as the different settings readily show. Hence the second flaw in Cline's argument for uniform usage: it ignores the cardinal rule that "[s]tatutory language must be read in context [since] a phrase 'gathers meaning from the words around it.'" *Jones* v. *United States*, 527 U. S. 373, 389 (1999) (quoting *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961)). The point here is that we are not asking an abstract question about the meaning of "age"; we are seeking the meaning of the whole phrase "discriminate . . . because of such individual's age," where it occurs in the ADEA, 29 U. S. C. § 623(a)(1). As we have said, social history emphatically reveals an understanding of age discrimination as aimed against the old, and the statutory reference to age discrimination in this idiomatic sense is confirmed by legislative history. For the very reason that reference to context shows that "age" means "old age" when teamed with "discrimination," the provision of an affirmative defense when age is a bona fide occupational qualification readily shows that "age" as a qualification means comparative youth. As

---

(1933). The passage has become a staple of our opinions. See *United States* v. *Cleveland Indians Baseball Co.*, 532 U. S. 200, 213 (2001); *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251, 262 (1995); *CAB* v. *Delta Air Lines, Inc.*, 367 U. S. 316, 328 (1961).

context tells us that "age" means one thing in § 623(a)(1) and another in § 623(f),[9] so it also tells us that the presumption of uniformity cannot sensibly operate here.[10]

The comparisons JUSTICE THOMAS urges, *post*, at 608–612, to *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976), and *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75 (1998), serve to clarify our position. Both cases involved Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, and its prohibition on employment discrimination "because of [an] individual's *race* . . . [or] *sex*," § 2000e–2(a)(1) (emphasis added). The term "age" employed by the ADEA is not, however, comparable to the terms "race" or "sex" employed by Title VII. "Race" and "sex" are general terms that in every day usage require modifiers to indicate

---

[9] An even wider contextual enquiry supports our conclusion, for the uniformity Cline and the EEOC claim for the uses of "age" within the ADEA itself would introduce unwelcome discord among the federal statutes on employee benefit plans. For example, the Tax Code requires an employer to allow certain employees who reach age 55 to diversify their stock ownership plans in part, 26 U. S. C. § 401(a)(28)(B); removes a penalty on early distributions from retirement plans at age 59½, § 72(t)(2)(A)(i); requires an employer to allow many employees to receive benefits immediately upon retiring at age 65, § 401(a)(14); and requires an employer to adjust upward an employee's pension benefits if that employee continues to work past age 70½, § 401(a)(9)(C)(iii). The Employee Retirement Income Security Act of 1974 makes similar provisions. See, *e. g.*, 29 U. S. C. § 1002(24) ("normal retirement age" may come at age 65, although the plan specifies later); § 1053(a) (a plan must pay full benefits to employees who retire at normal retirement age). Taken one at a time any of these statutory directives might be viewed as an exception Congress carved out of a generally recognized principle that employers may not give benefits to older employees that they withhold from younger ones. Viewed as a whole, however, they are incoherent with the alleged congressional belief that such a background principle existed.

[10] Essentially the same answer suffices for Cline's and the EEOC's suggestion that our reading is at odds with the statute's ban on employers' "print[ing] . . . any notice or advertisement relating to employment . . . indicating any preference, limitation, specification, or discrimination . . . based on age." § 623(e).

any relatively narrow application. We do not commonly understand "race" to refer only to the black race, or "sex" to refer only to the female. But the prohibition of age discrimination is readily·read more narrowly than analogous provisions dealing with race and sex. That narrower reading is the more natural one in the textual setting, and it makes perfect sense because of Congress's demonstrated concern with distinctions that hurt older people.

## B

The second objection has more substance than the first, but still not enough. The record of congressional action reports a colloquy on the Senate floor between two of the legislators most active in pushing for the ADEA, Senators Javits and Yarborough. Senator Javits began the exchange by raising a concern mentioned by Senator Dominick, that "the bill might not forbid discrimination between two persons each of whom would be between the ages of 40 and 65." 113 Cong. Rec. 31255 (1967). Senator Javits then gave his own view that, "if two individuals ages 52 and 42 apply for the same job, and the employer selected the man aged 42 solely . . . because he is younger than the man 52, then he will have violated the act," and asked Senator Yarborough for his opinion. *Ibid.* Senator Yarborough answered that "[t]he law prohibits age being a factor in the decision to hire, as to one age over the other, whichever way [the] decision went." *Ibid.*

Although in the past we have given weight to Senator Yarborough's views on the construction of the ADEA because he was a sponsor, see, *e. g., Public Employees Retirement System of Ohio* v. *Betts,* 492 U. S. 158, 179 (1989), his side of this exchange is not enough to unsettle our reading of the statute. It is not merely that the discussion was prompted by the question mentioned in *O'Connor* v. *Consolidated Coin Caterers Corp.,* 517 U. S. 308 (1996), the possibility of a 52-year-old suing over a preference for someone

younger but in the over-40 protected class. What matters is that the Senator's remark, "whichever way [the] decision went," is the only item in all the 1967 hearings, reports, and debates going against the grain of the common understanding of age discrimination.[11] Even from a sponsor, a single outlying statement cannot stand against a tide of context and history, not to mention 30 years of judicial interpretation producing no apparent legislative qualms. See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 118 (1980) ("[O]rdinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history").

## C

The third objection relies on a reading consistent with the Yarborough comment, adopted by the agency now charged with enforcing the statute, as set out at 29 CFR § 1625.2(a) (2003), and quoted in full, n. 1, *supra.* When the EEOC adopted § 1625.2(a) in 1981, shortly after assuming administrative responsibility for the ADEA, it gave no reasons for the view expressed, beyond noting that the provision was carried forward from an earlier Department of Labor regulation, see 44 Fed. Reg. 68858 (1979); 46 Fed. Reg. 47724 (1981); that earlier regulation itself gave no reasons, see 33 Fed. Reg. 9172 (1968) (reprinting 29 CFR § 860.91, rescinded by 46 Fed. Reg. 47724 (1981)).

---

[11] It is only fair to add, though, that Senator Dominick himself does appear to have sought clarification on the question presented, asking in a statement appended to the Committee Report whether "the prospective employer [is] open to a charge of discrimination if he hires the younger man and would . . . be open to a charge of discrimination by the younger man if he hired the older one." S. Rep. No. 723, 90th Cong., 1st Sess., 15–16 (1967); see also *id.*, at 16 (mentioning confusion among committee counsel). Senator Dominick considered this result undesirable. See *ibid.* ("[M]any legal complexities surrounding this bill . . . have not been adequately dealt with by the committee").

The parties contest the degree of weight owed to the EEOC's reading, with General Dynamics urging us that *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944), sets the limit, while Cline and the EEOC say that §1625.2(a) deserves greater deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). Although we have devoted a fair amount of attention lately to the varying degrees of deference deserved by agency pronouncements of different sorts, see *United States* v. *Mead Corp.*, 533 U. S. 218 (2001); *Christensen* v. *Harris County*, 529 U. S. 576 (2000), the recent cases are not on point here. In *Edelman* v. *Lynchburg College*, 535 U. S. 106, 114 (2002), we found no need to choose between *Skidmore* and *Chevron*, or even to defer, because the EEOC was clearly right; today, we neither defer nor settle on any degree of deference because the Commission is clearly wrong.

Even for an agency able to claim all the authority possible under *Chevron*, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent. *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446–448 (1987) (citing *Chevron, supra*, at 843, n. 9). Here, regular interpretive method leaves no serious question, not even about purely textual ambiguity in the ADEA. The word "age" takes on a definite meaning from being in the phrase "discriminat[ion] . . . because of such individual's age," occurring as that phrase does in a statute structured and manifestly intended to protect the older from arbitrary favor for the younger.

IV

We see the text, structure, purpose, and history of the ADEA, along with its relationship to other federal statutes, as showing that the statute does not mean to stop an employer from favoring an older employee over a younger one. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE SCALIA, dissenting.

The Age Discrimination in Employment Act of 1967 (ADEA or Act), 29 U. S. C. §§ 621–634, makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." § 623(a)(1). The question in this case is whether, in the absence of an affirmative defense, the ADEA prohibits an employer from favoring older over younger workers when both are protected by the Act, i. e., are 40 years of age or older.

The Equal Employment Opportunity Commission (EEOC) has answered this question in the affirmative. In 1981, the agency adopted a regulation which states, in pertinent part:

> "It is unlawful in situations where this Act applies, for an employer to discriminate in hiring or in any other way by giving preference because of age between individuals 40 and over. Thus, if two people apply for the same position, and one is 42 and the other 52, the employer may not lawfully turn down either one on the basis of age, but must make such decision on the basis of some other factor." 29 CFR § 1625.2(a) (2003).

This regulation represents the interpretation of the agency tasked by Congress with enforcing the ADEA. See 29 U. S. C. § 628.

The Court brushes aside the EEOC's interpretation as "clearly wrong." *Ante*, at 600. I cannot agree with the contention upon which that rejection rests: that "regular interpretive method leaves no serious question, not even about purely textual ambiguity in the ADEA." *Ibid.* It is evident, for the reasons given in Part II of JUSTICE THOMAS's dissenting opinion, that the Court's interpretive method is anything but "regular." And for the reasons given in Part I of that opinion, the EEOC's interpretation is neither foreclosed by the statute nor unreasonable.

Because § 623(a) "does not unambiguously require a different interpretation, and . . . the [EEOC's] regulation is an entirely reasonable interpretation of the text," *Barnhart* v. *Thomas, ante,* at 29–30, I would defer to the agency's authoritative conclusion. See *United States* v. *Mead Corp.,* 533 U. S. 218, 257 (2001) (SCALIA, J., dissenting). I respectfully dissent.

JUSTICE THOMAS, with whom JUSTICE KENNEDY joins, dissenting.

This should have been an easy case. The plain language of 29 U. S. C. § 623(a)(1) mandates a particular outcome: that the respondents are able to sue for discrimination against them in favor of older workers. The agency charged with enforcing the statute has adopted a regulation and issued an opinion as an adjudicator, both of which adopt this natural interpretation of the provision. And the *only* portion of legislative history relevant to the question before us is consistent with this outcome. Despite the fact that these traditional tools of statutory interpretation lead inexorably to the conclusion that respondents can state a claim for discrimination against the relatively young, the Court, apparently disappointed by this result, today adopts a different interpretation. In doing so, the Court, of necessity, creates a new tool of statutory interpretation, and then proceeds to give this newly created "social history" analysis dispositive weight. Because I cannot agree with the Court's new approach to interpreting antidiscrimination statutes, I respectfully dissent.

I

"The starting point for [the] interpretation of a statute is always its language," *Community for Creative Non-Violence* v. *Reid,* 490 U. S. 730, 739 (1989), and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 253–254 (1992). Thus,

rather than looking through the historical background of the Age Discrimination in Employment Act of 1967 (ADEA), I would instead start with the text of § 623(a)(1) itself, and if "the words of [the] statute are unambiguous," my "judicial inquiry [would be] complete." *Id.*, at 254 (internal quotation marks omitted).

The plain language of the ADEA clearly allows for suits brought by the relatively young when discriminated against in favor of the relatively old. The phrase "discriminate . . . because of such individual's age," 29 U. S. C. § 623(a)(1), is not restricted to discrimination because of relatively *older* age. If an employer fired a worker for the sole reason that the worker was under 45, it would be entirely natural to say that the worker had been discriminated against because of his age. I struggle to think of what other phrase I would use to describe such behavior. I wonder how the Court would describe such incidents, because the Court apparently considers such usage to be unusual, atypical, or aberrant. See *ante*, at 591 (concluding that the "common usage" of language would exclude discrimination against the relatively young from the phrase "discriminat[ion] . . . because of [an] individual's age").

The parties do identify a possible ambiguity, centering on the multiple meanings of the word "age." As the parties note, "age" does have an alternative meaning, namely, "[t]he state of being old; old age." American Heritage Dictionary 33 (3d ed. 1992); see also Oxford American Dictionary 18 (1999); Webster's Third New International Dictionary 40 (1993). First, this secondary meaning is, of course, less commonly used than the primary meaning, and appears restricted to those few instances where it is clear in the immediate context of the phrase that it could have no other meaning. The phrases "hair white with age," American Heritage Dictionary, *supra*, at 33, or *"eyes . . . dim with age,"* Random House Dictionary of the English Language 37 (2d ed. 1987), cannot possibly be using "age" to include "young

age," unlike a phrase such as "he fired her because of her age." Second, the use of the word "age" in other portions of the statute effectively destroys any doubt. The ADEA's advertising prohibition, 29 U. S. C. § 623(e), and the bona fide occupational qualification defense, § 623(f)(1), would both be rendered incoherent if the term "age" in those provisions were read to mean only "older age."[1] Although it is true that the " 'presumption that identical words used in different parts of the same act are intended to have the same meaning' " is not "rigid" and can be overcome when the context is clear, *ante*, at 595 (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U. S. 427, 433 (1932)), the presumption is not rebutted here. As noted, the plain and common reading of the phrase "such individual's age" refers to the individual's chronological age. At the very least, it is manifestly unclear that it bars *only* discrimination against the relatively older. Only by incorrectly concluding that § 623(a)(1) clearly and unequivocally bars only discrimination as "against the older," *ante*, at 591, can the Court then conclude that the "context" of §§ 623(f)(1) and 623(e) allows for an alternative meaning of the term "age," *ante*, at 596–597.

The one structural argument raised by the Court in defense of its interpretation of "discriminates . . . because of such individual's age" is the provision limiting the ADEA's protections to those over 40 years of age. See 29 U. S. C.

---

[1] Section 623(f)(1) provides a defense where "age is a bona fide occupational qualification." If "age" were limited to "older age," then § 623(f)(1) would provide a defense only where a defense is not needed, since under the Court's reading, discrimination against the relatively young is always legal under the ADEA. Section 623(e) bans the "print[ing] . . . [of] any notice or advertisement relating to . . . indicating any preference, limitation, specification, or discrimination . . . based on age." Again, if "age" were read to mean only "older age," an employer could print advertisements asking only for young applicants for a new job (where hiring or considering only young applicants is banned by the ADEA), but could not print advertisements requesting only older applicants (where hiring only older applicants would be legal under the Court's reading of the ADEA).

§ 631(a). At first glance, this might look odd when paired with the conclusion that § 623(a)(1) bars discrimination against the relatively young as well as the relatively old, but there is a perfectly rational explanation. Congress could easily conclude that age discrimination directed against those under 40 is not as damaging, since a young worker unjustly fired is likely to find a new job or otherwise recover from the discrimination. A person over 40 fired due to irrational age discrimination (whether because the worker is too young or too old) might have a more difficult time recovering from the discharge and finding new employment. Such an interpretation also comports with the many findings of the Wirtz report, United States Dept. of Labor, The Older American Worker: Age Discrimination in Employment (June 1965), and the parallel findings in the ADEA itself. See, e. g., 29 U. S. C. § 621(a)(1) (finding that "older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs"); § 621(a)(3) (finding that "the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers").

This plain reading of the ADEA is bolstered by the interpretation of the agency charged with administering the statute. A regulation issued by the Equal Employment Opportunity Commission (EEOC) adopts the view contrary to the Court's, 29 CFR § 1625.2(a) (2003), and the only binding EEOC decision that addresses the question before us also adopted the view contrary to the Court's, see *Garrett* v. *Runyon*, Appeal No. 01960422, 1997 WL 574739, *1 (EEOC, Sept. 5, 1997). I agree with the Court that we need not address whether deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), would apply to the EEOC's regulation in this case. See *ante*, at 600. Of course, I so conclude because the EEOC's interpretation is consistent with the best reading

of the statute. The Court's position, on the other hand, is untenable. Even if the Court disagrees with my interpretation of the language of the statute, it strains credulity to argue that such a reading is so unreasonable that an agency could not adopt it. To suggest that, in the instant case, the "regular interpretive method leaves no serious question, not even about purely textual ambiguity in the ADEA," *ibid.*, is to ignore the entirely reasonable (and, incidentally, correct) contrary interpretation of the ADEA that the EEOC and I advocate.

Finally, the only relevant piece of legislative history addressing the question before the Court—whether it would be possible for a younger individual to sue based on discrimination against him in favor of an older individual—comports with the plain reading of the text. Senator Yarborough, in the only exchange that the parties identified from the legislative history discussing this particular question, confirmed that the text really meant what it said. See 113 Cong. Rec. 31255 (1967).[2] Although the statute is clear, and hence there is no need to delve into the legislative history, this history merely confirms that the plain reading of the text is correct.

## II

Strangely, the Court does not explain why it departs from accepted methods of interpreting statutes. It does, however, clearly set forth its principal reason for adopting its particular reading of the phrase "discriminate . . . based on [an] individual's age" in Part III–A of its opinion. "The point here," the Court states, "is that we are not asking an abstract question about the meaning of 'age'; we are seeking the meaning of the whole phrase 'discriminate . . . because of such individual's age.' . . . As we have said, *social history* emphatically reveals an understanding of age discrimination as aimed against the old, and the statutory reference to age

---

[2] See *ante*, at 598 (citing exchange between Sens. Yarborough and Javits).

discrimination in this idiomatic sense is confirmed by legislative history." *Ante,* at 596 (emphasis added). The Court does not define "social history," although it is apparently something different from legislative history, because the Court refers to legislative history as a separate interpretive tool in the very same sentence. Indeed, the Court has never defined "social history" in any previous opinion, probably because it has never sanctioned looking to "social history" as a method of statutory interpretation. Today, the Court takes this unprecedented step, and then places dispositive weight on the new concept.

It appears that the Court considers the "social history" of the phrase "discriminate . . . because of [an] individual's age" to be the principal evil that Congress targeted when it passed the ADEA. In each section of its analysis, the Court pointedly notes that there was no evidence of widespread problems of antiyouth discrimination, and that the primary concerns of Executive Branch officials and Members of Congress pertained to problems that workers generally faced as they increased in age.[3] The Court reaches its final, legal conclusion as to the meaning of the phrase (that "ordinary people" employing the common usage of language would "talk about discrimination because of age [as] naturally [referring to] discrimination against the older," *ante,* at 591) only after concluding both that "the ADEA was concerned to protect a relatively old worker from discrimination that works to the advantage of the relatively young" and that

---

[3] See *ante,* at 587 ("The [Wirtz] report contains no suggestion that reactions to age level off at some point, and it was devoid of any indication that the Secretary [of Labor] had noticed unfair advantages accruing to older employees at the expense of their juniors"); *ante,* at 589 (finding from the records of congressional hearings "nothing suggesting that any workers were registering complaints about discrimination in favor of their seniors"); *ante,* at 590 (finding that, with one exception, "all the findings and statements of objectives are either cast in terms of the effects of age as intensifying over time, or are couched in terms that refer to 'older' workers, explicitly or implicitly relative to 'younger' ones").

"the record is devoid of any evidence that younger workers were suffering at the expense of their elders, let alone that a social problem required a federal statute to place a younger worker in parity with an older one." *Ante*, at 590–591. Hence, the Court apparently concludes that if Congress has in mind a particular, principal, or primary form of discrimination when it passes an antidiscrimination provision prohibiting persons from "discriminating because of [some personal quality]," then the phrase "discriminate because of [some personal quality]" only covers the principal or most common form of discrimination relating to this personal quality.

The Court, however, has not typically interpreted nondiscrimination statutes in this odd manner. "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998). The oddity of the Court's new technique of statutory interpretation is highlighted by this Court's contrary approach to the racial-discrimination prohibition of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*

There is little doubt that the motivation behind the enactment of the Civil Rights Act of 1964 was to prevent invidious discrimination against racial minorities, especially blacks. See 110 Cong. Rec. 6552 (1964) (statement of Sen. Humphrey) ("The goals of this bill are simple ones: To extend to Negro citizens the same rights and the same opportunities that white Americans take for granted"). President Kennedy, in announcing his Civil Rights proposal, identified several social problems, such as how a "Negro baby born in America today . . . has about one-half as much chance of completing a high school as a white baby . . . one-third as much chance of becoming a professional man, twice as much chance of becoming unemployed, . . . and the prospects of earning only half

as much." Radio and Television Report to the American People on Civil Rights, Public Papers of the Presidents, John F. Kennedy, No. 237, June 11, 1963, pp. 468–469 (1964). He gave no examples, and cited no occurrences, of discrimination against whites or indicated that such discrimination motivated him (even in part) to introduce the bill. Considered by some to be the impetus for the submission of a Civil Rights bill to Congress,[4] the 1961 Civil Rights Commission Report focused its employment section solely on discrimination against racial minorities, noting, for instance, that the "twin problems" of unemployment and a lack of skilled workers "are magnified for minority groups that are subject to discrimination." 3 U. S. Commission on Civil Rights Report 1 (1961). It also discussed and analyzed the more severe unemployment statistics of black workers compared to white workers. See *id.*, at 1–4; see also *id.*, at 153 (summarizing findings of the Commission, listing examples only of discrimination against blacks). The report presented no evidence of any problems (or even any incidents) of discrimination against whites.

The congressional debates and hearings, although filled with statements decrying discrimination against racial minorities and setting forth the disadvantages those minorities suffered, contain no references that I could find to any problem of discrimination against whites. See, *e. g.*, 110 Cong. *Rec. 7204 (1964) (statement of Sen. Clark)* ("I turn now to the background of racial discrimination in the job market, which is the basis for the need for this legislation. I suggest that economics is at the heart of racial bias. The Negro has been condemned to poverty because of lack of equal job opportunities. This poverty has kept the Negro out of the mainstream of American life"); *id.*, at 7379 (statement of Sen. Kennedy) ("Title VII is directed toward what, in my judgment, American Negroes need most to increase their health

---

[4] See R. Loevy, To End All Segregation: The Politics of the Passage of the Civil Rights Act of 1964, p. 24 (1990).

and happiness. . . . [T]o be deprived of the chance to make a decent living and of the income needed to bring up children is a family tragedy"); *id.*, at 6547 (statement of Sen. Humphrey) ("I would like to turn now to the problem of racial discrimination in employment. At the present time Negroes and members of other minority groups do not have an equal chance to be hired, to be promoted, and to be given the most desirable assignments"); *ibid.* (citing disfavorable unemployment rates of nonwhites as compared to whites); *ibid.* ("Discrimination in employment is not confined to any region—it is widespread in every part of the country. It is harmful to Negroes and to members of other minority groups"); *id.*, at 6548 ("The crux of the problem is to open employment opportunities for Negroes in occupations which have been traditionally closed to them"); *id.*, at 6562 (statement of Sen. Kuchel) ("If a Negro or a Puerto Rican or an Indian or a Japanese-American or an American of Mexican descent cannot secure a job and the opportunity to advance on that job commensurate with his skill, then his right to be served in places of public accommodation is a meaningless one . . . . And if a member of a so-called minority group believes that no matter how hard he studies, he will be confronted with a life of unskilled and menial labor, then a loss has occurred, not only for a human being, but also for our Nation"); *id.*, at 6748 (statement of Sen. Moss) ("All of us, that is except the person who is discriminated against on the basis of race, color, or national origin . . . . He frequently knows that he is not going to school to prepare for a job. . . . He frequently knows that no matter how hard he works, how diligently he turns up day after day, how much overtime he puts in, that he will never get to be the boss of a single work crew or the foreman of a single division. And that is what the fair employment practices title is about—not the right to displace a white man or be given preference over him—but simply the right to be in the running"). I find no evidence that even a single legislator appeared concerned about

whether there were incidents of discrimination against whites, and I find no citation to any such incidents.

In sum, there is no record evidence "that [white] workers were suffering at the expense of [racial minorities]," and in 1964, discrimination against whites in favor of racial minorities was hardly "a social problem requir[ing] a federal statute to place a [white] worker in parity with [racial minorities]." *Ante*, at 591. Thus, "talk about discrimination because of [race would] naturally [be] understood to refer to discrimination against [racial minorities]." *Ibid.* In light of the Court's opinion today, it appears that this Court has been treading down the wrong path with respect to Title VII since at least 1976.[5] See *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976) (holding that Title VII protected whites discriminated against in favor of racial minorities).

In *McDonald*, the Court relied on the fact that the terms of Title VII, prohibiting the discharge of "any individual" because of "such individual's race," 42 U. S. C. § 2000e–2(a)(1), "are not limited to discrimination against members of any particular race." 427 U. S., at 278–279. Admittedly, the Court there also relied on the EEOC's interpretation of Title VII as given in its decisions, *id.*, at 279–280, and also on statements from the legislative history of the enactment of Title VII. See *id.*, at 280 (citing 110 Cong. Rec., at 2578 (remarks of Rep. Celler); *id.*, at 7218 (memorandum of Sen. Clark); *id.*, at 7213 (memorandum of Sens. Clark and Case); *id.*, at 8912 (remarks of Sen. Williams)). But, in the instant case, as I have already noted above, see *supra*, at 605, the EEOC has issued a regulation and a binding EEOC decision adopting the view contrary to the Court's and in line with the interpretation of Title VII. And, again as already noted, see *supra*, at 606, the only relevant piece of legislative history with respect to the question before the Court is in the same posture as the legislative history behind Title VII:

---

[5] The same could likely be said, of course, of most, if not all, of the other provisions of the Civil Rights Act of 1964.

namely, a statement that age discrimination cuts both ways and a relatively younger individual could sue when discriminated against. See 113 Cong. Rec., at 31255 (statement of Sen. Yarborough).

It is abundantly clear, then, that the Court's new approach to antidiscrimination statutes would lead us far astray from well-settled principles of statutory interpretation. The Court's examination of "social history" is in serious tension (if not outright conflict) with our prior cases in such matters. Under the Court's current approach, for instance, *McDonald* and *Oncale*[6] are wrongly decided. One can only hope that this new technique of statutory interpretation does not catch on, and that its errors are limited to only this case.

Responding to this dissent, the Court insists that it is not making this "particular mistake," namely, "confining the application of terms used in a broad sense to the relatively narrow class of cases that prompted Congress to address their subject matter." *Ante,* at 592, n. 5. It notes that, in contrast to the term "age," the terms "race" and "sex" are "general terms that in every day usage require modifiers to indicate any relatively narrow application." *Ante,* at 597–598. The Court, thus, seems to claim that it is merely trying to identify whether the "narrower reading" of the term "age" is "the more natural one in the textual setting." *Ante,* at 598.[7] But the Court does not seriously attempt to ana-

---

[6] "[M]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII." *Oncale,* 523 U. S., at 79. I wonder if there is even a single reference in all the committee reports and congressional debates on Title VII's prohibition of sex discrimination to any "social problem requir[ing] a federal statute [to correct]," *ante,* at 591, arising out of excessive male-on-male sexual harassment.

[7] The Court phrases this differently: It states that the "prohibition of age *discrimination* is readily read more narrowly than analogous provisions dealing with race and sex." *Ante,* at 598 (emphasis added). But this can only be true if the Court believes that the term "age" is more appropriately read in the narrower sense.

lyze whether the term "age" is more naturally read narrowly in the context of § 623(a)(1). Instead, the Court jumps immediately to, and rests its entire "common usage" analysis, *ante*, at 591, on, the "social history" of the "whole phrase 'discriminate . . . because of such individual's age.'" *Ante*, at 596. In other words, the Court concludes that the "common usage" of "age discrimination" refers exclusively to discrimination against the relatively old *only because* the "social history" of the phrase as a whole mandates such a reading. As I have explained here, the "social history" of the "whole phrase 'discriminate . . . because of such individual's age,'" *ibid.*, found in § 623(a)(1) is no different than the "social history" of the whole phrase "discriminate . . . because of such individual's race." 42 U. S. C. § 2000e-2(a)(1).

\* \* \*

As the ADEA clearly prohibits discrimination because of an individual's age, whether the individual is too old or too young, I would affirm the Court of Appeals. Because the Court resorts to interpretive sleight of hand to avoid addressing the plain language of the ADEA, I respectfully dissent.